**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SQUARE RING, INC.,                              )
                                                )
                    Plaintiff,                  )
                                                )     C.A. No.  09-563-GMS-CJB
          v.                                    )
                                                )
JOHN DOE-1, CHIEF EXECUTIVE OFFICER,            )
JOHN DOE-2, CHIEF TECHNICAL                     )
OFFICER, JOHN DOE-3, PRESIDENT, JOHN            )
DOES 4-10, Individually and as officers,        )
directors, shareholders and/or principals of    )
USTREAM.TV, INC., a/k/a                          )
USTREAM.TV.COM, a/k/a USTREAM,                   )
                                                )
and                                             )
                                                )
USTREAM.TV, INC., a/k/a,                         )
USTREAM.TV.COM, a/k/a USTREAM,                   )
                                                )
                    Defendants.                 )

**DEFENDANT USTREAM'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT THAT IT IS ENTITLED
TO "SAFE HARBOR" STATUS UNDER THE DMCA, 17 U.S.C. § 512**

OF COUNSEL:

Rodger R. Cole
Songmee Connolly
Elizabeth J. White
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500

Dated:  July 31, 2013
1117060 / 35415

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Ustream.TV, Inc.,
a/k/a, Ustream.TV.com, a/k/a Ustream*

## TABLE OF CONTENTS

Page

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ...........................1

SUMMARY OF ARGUMENT ...........................................................................................1

STATEMENT OF RELEVANT FACTS.............................................................................2

I.     Ustream ................................................................................................................2

II.    Square Ring's Allegations ....................................................................................4

ARGUMENT ......................................................................................................................6

I.     Applicable Legal Standard on a Motion for Summary Judgment....................6

II.    There Is no Genuine Issue of Material Fact that Ustream Qualifies for
       Safe Harbor Under the DMCA...........................................................................7

       A.     Background of DMCA ..............................................................................7

       B.     Ustream Readily Satisfies the Threshold Eligibility Requirements
              for Safe Harbor Status...............................................................................8

              1.     Ustream's Activities Fall Squarely Within the Broad Scope
                     of "Service Provider," as Defined Under the DMCA ...............8

              2.     Ustream Has Adopted and Reasonably Implemented a Policy
                     for the Termination in Appropriate Circumstances of
                     Repeat Infringers ........................................................................9

              3.     Ustream Does Not Interfere with Standard Technical Means
                     by Which Copyright Holders May Identify Protected
                     Copyrighted Works ...................................................................11

       C.     Ustream Is Sheltered from Liability Under 17 U.S.C. 512(c)............12

              1.     Prior to March 21, 20009, Ustream Did Not Have the
                     Requisite Actual or Apparent Knowledge of the
                     Disputed Broadcasts .................................................................13

              2.     Once Ustream Obtained Requisite Knowledge of the
                     Allegedly Infringing Broadcasts, it Acted Expeditiously to
                     Remove the Material..................................................................15

              3.     Ustream Satisfies the Requirements of 512(c)(1)(B) Because
                     it Does Not Have the Requisite "Right and Ability to Control"
                     Online Content Generated by its Users. ...................................16

III.   The Limited Injunctive Relief Provided under the DMCA Is Moot. ..............17

CONCLUSION..................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................6

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .................................................*passim*

*Hendrickson v. Ebay, Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001)................................................ 14, 15, 16

*Io Grp., Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008)......................................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................................6

*Obodai v. Demand Media, Inc.*,
No. 11 Civ 2503 (PKC), 2012 U.S. Dist. LEXIS 83109
(S.D.N.Y. June 12, 2012) ........................................................................ 8, 12, 13

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
Nos. 09-55902, 09-56777, 10-55732, 2013 U.S. App. LEXIS 5100
(9th Cir. Cal. Mar. 14, 2013) ....................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ..................................................................... 7, 8, 9, 13

*Wolk v. Kodak Imaging Network, Inc.*,
840 F. Supp. 2d 724 (S.D.N.Y. 2011)........................................................*passim*

## STATUTES AND RULES

17 U.S.C. 512....................................................................................................*passim*

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Defendant Ustream, Inc. ("Ustream") is a user-generated content website that allows its users to broadcast and share video content over the internet.  On July 30, 2009, Plaintiff Square Ring, Inc. ("Square Ring") filed this civil action against Ustream, alleging various copyright and common law trademark infringement claims arising from three purported infringing end-user streams of one subject work (the March 21 Broadcast) on Ustream's website.  D.I. 1.  On March 30, 2010, Ustream filed its answer to the Complaint denying liability, including that, on the basis as an online service provider, it is immune from monetary liability for copyright infringement under the "safe harbor" provisions of the Digital Millennium Copyright Act ("DMCA").  D.I. 26.  At the telephone scheduling conference on October 31, 2012, the Court authorized Ustream to file this summary judgment motion addressing Ustream's DMCA "safe harbor" defense.  Declaration of Elizabeth White ("White Decl.")[1] at ¶ 2, Ex. A.  Fact discovery is now closed (D.I. 60), and this case is ripe for determination.

## SUMMARY OF ARGUMENT

Because there is no genuine issue of fact that Ustream is entitled to safe harbor status under 17 U.S.C. § 512(c), the Court should grant summary judgment finding that Ustream is protected from any monetary liability arising from Square Ring's copyright infringement claims.  Specifically, Ustream argues as follows:

(1)     The undisputed evidence demonstrates that Ustream satisfies the DMCA's threshold eligibility requirements for safe harbor status; and

(2)     The undisputed evidence demonstrates that Ustream satisfies the specific requirements for safe harbor under 17 U.S.C. § 512(c).

---

[1] "White Decl." refers to the Declaration of Elizabeth White submitted herewith.

STATEMENT OF RELEVANT FACTS

**I.      Ustream**

      Launched in March 2007, Ustream is a user-generated content website, allowing millions throughout the world to freely view and share a wide variety of content ranging from news, politics, music, entertainment, education, and personal events through its site and services. Ustream's leading live interactive open platform allows anyone with a camera and an internet connection to broadcast live events and share them with an audience of unlimited size.[2]  Each month, Ustream's users broadcast approximately 1,488,554 live streams and 429,157 recorded broadcasts.  Declaration of Sheryl Zapanta ("Zapanta Decl.") at ¶ 2 (filed herewith).

      Now and at all times relevant to this lawsuit, before any of Ustream's users are permitted to broadcast or share content on Ustream's website, they must register with Ustream by providing an email address, user name, and password.  Declaration of Suzanne Tran ("Tran Decl.") at ¶ 2 (filed herewith); Zapanta Decl. at ¶ 3.  They must also read and agree to Ustream's Terms of Service before they are allowed to register.  *Id.*  The Terms of Service expressly prohibited Ustream subscribers from using the website to "TRANSMIT, ROUTE, PROVIDE CONNECTIONS TO OR STORE ANY MATERIAL THAT INFRINGES COPYRIGHTED WORKS OR OTHERWISE VIOLATES OR PROMOTES THE VIOLATION OF THE INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY" and further state that "Ustream has adopted and implemented a policy that provides for the termination in appropriate circumstances of the accounts of users or Members who repeatedly infringe or are believed to be infringing the rights of copyright holders."  *Id.*  Before a registered user can upload and stream content, they are reminded of Ustream's zero tolerance policy, of their agreement to the Terms of Service (which includes to not broadcast any infringing material), and that a violation may lead to

---

[2]  *See* https://www.ustream.tv/platform/pro#live-streaming

2

suspension or a permanent ban from using the site.  Zapanta Decl. at ¶ 3.  All of these policies were in place at the time of the March 21 Broadcast.  Tran Decl. at ¶ 2.

Ustream also maintains a Copyright and IP Policy ("Copyright Policy"), which is publicly available and accessible on Ustream's website now and at all times relevant to the allegations in this lawsuit.  Tran Decl. at ¶ 3 (a true and correct copy of the 2009 version of Ustream's Copyright Policy, which was available and accessible on Ustream's website at least as early as March 2009 and at all times relevant to the allegations in this lawsuit, is attached as Exhibit B to the Tran Decl.); Zapanta Decl. at ¶ 4.  The Copyright Policy provides information and a simple means by which copyright owners can report any alleged infringement to Ustream's designated copyright agent pursuant to the Digital Millennium Copyright Act ("DMCA"), including by emailing copyright@ustream.tv with the requisite DMCA notice information.  Tran Decl. at ¶ 3; Zapanta Decl. at ¶ 4.  Copyright owners are instructed to submit a list of the copyrighted works and to identify the URL where the allegedly infringing content can be found.  Copyright owners can either submit their information online, by filling out the website form, or by emailing the requested information to Ustream's designated copyright agent: copyright@ustream.tv.  Tran Decl. at ¶ 3; Zapanta Decl. at ¶ 4.

Since 2008 and at all times relevant to this lawsuit, a team of Ustream employees located in the San Francisco Bay Area and in Budapest, Hungary —referred to as the "Content Monitoring Team"—has actively monitored and responded to incoming copyright infringement notices.  First, they review each incoming notice to make sure that it includes the requisite DMCA information listed in Ustream's Copyright Policy.  Tran Decl. at ¶ 4 (a true and correct copy of Ustream's written policy for addressing incoming copyright infringement notices, the "DMCA Checklist," is attached as Exhibit C to the Tran Decl.); Zapanta Decl. at ¶ 5.  If the

3

notice does not contain the requisite DMCA information, then a member of the Content Monitoring Team will promptly respond to the complainant by email, asking them to supplement their notice with the missing information. *Id.* If the notice *does* contain the requisite information, then Ustream will promptly—often the same day—remove or disable access to the identified infringing channel URL. *Id.* If Ustream receives multiple complaints about a particular user, then in addition to disabling access to specific channel URLs, in appropriate circumstances it will terminate that user's account entirely.[3] *Id.*

Another aspect of Ustream's vigilant copyright policy is its tracking and logging of all incoming DMCA complaints. Ustream archives and logs each DMCA complaint it receives in a database that records the following information for each incident of infringement:  the URL and name of the infringing Ustream channel; the user ID associated with the infringing broadcast; the date and time that Ustream removed the infringing content; the length of the broadcast; the viewer count; and the reason for the ban. Zapanta Decl. at ¶ 6. The purpose of these logs is to ensure proper implementation of Ustream's copyright policies, including its policy of responding expeditiously to all DMCA-compliant notices. Tran Decl. at ¶ 5; Zapanta Decl. at ¶ 6.

## II.    Square Ring's Allegations

Plaintiff Square Ring is a boxing promotional company majority-owned by boxing professional Roy Jones, Jr. D.I. 1 at ¶ 1. Plaintiff acquires rights to boxing matches from fighters to promote boxing events. *Id.* Such promotion includes selling tickets to the public and licensing rights to television networks to distribute the event, on a pay-per-view basis, to residential purchasers and/or on a closed circuit basis to bars and restaurants for commercial exhibition in public venues. *Id.* Plaintiff claims it is the copyright owner in a boxing and mixed

---

[3]   Subscribers to Ustream create their own user name and channel name(s); the channel name is then used to automatically generate the unique URL on which the user's content can be uploaded and streamed. One user may have multiple channels.

4

martial arts broadcast that took place approximately three years ago between Roy Jones, Jr. and Omar Sheika on Saturday, March 21, 2009 (the "March 21 Broadcast").[4] *Id*. at ¶ 3.  This March 21 Broadcast is the only work at issue in this litigation.

On March 17, 2009—four days before the March 21 Broadcast took place—Square Ring first contacted Ustream by emailing a purported "Copyright Infringement Notice" to Ustream's designated copyright agent concerning anticipated infringement of the upcoming March 21 Broadcast.  Tran Decl. at ¶ 6, Exhibit D (the "March 17 Notice").  The March 17 Notice threatened litigation if Ustream did not, within three business days, agree to, *inter alia*:  "ensure and provide proof…that all present links or postings referencing said dissemination are removed," and to make "arrangements, satisfactory with [Square Ring], for a removal tool which can immediately delete all offending content" or arrange for "appropriate staffing" for Square Ring to accomplish the same.  *Id*.  Ustream responded that day, requesting the specific channel information or URL so that it could identify the location of any infringing streams.  *See id*.  The next day, Square Ring did not identify such users or streams, but instead reiterated its demand, and sent a collection of logos, schedule of events and roster of matches related to the upcoming broadcast.  *See id*.  Based on the limited information about the Square Ring broadcast that Square Ring's counsel Mr. Lonstein had provided, Ustream employees that same day ran targeted keyword searches across the Ustream website to identify potentially infringing content.  After doing so, on March 18, they responded to Mr. Lonstein informing him that they had removed or disabled material identified in response to Square Ring's communications.  *Id*.  On March 18 and 20, Square Ring sent additional emails to Ustream's designated copyright agent, none of which

---

[4]  For purposes of this summary judgment motion only, Ustream assumes Square Ring the proper copyright claimant with a valid copyright in the March 21 Broadcast, Registration No. PA0001633913 (May 13, 2009).  Ustream reserves its right to challenge Square Ring's copyright ownership later.

provided a specific URL or channel identification, in which Square Ring demanded access to a "take down tool." *See id*. As of March 2009, Ustream had not yet developed its takedown tool technology. Tran Decl. at ¶ 8.

On Saturday, March 21, the event aired at approximately 6 p.m. PST and was streamed over the Ustream site on three user channels (none of which had been previously identified to Ustream). Tran Decl. at ¶ 7. On March 21, at 6:26 p.m., 7:13 p.m. and 9:33 p.m. (PST), Square Ring's third party monitoring agent delivered DMCA notices identifying three infringing URLs (the "March 21 DMCA Notices"). Tran Decl. at ¶ 7. Ustream responded the first business day thereafter, on Monday, March 23, disabling the channels and responding to Square Ring's notices between 7:53 p.m. and 7:55 p.m. that evening. *Id*. The allegedly infringing content was displayed solely at the volition of the users through Ustream's broadcast platform; Ustream did not review, approve, select, or upload the streamed content. *Id*. On July 30, 2009, Square Ring filed its Complaint alleging various copyright and common law trademark infringement claims related to the March 21 Broadcast. D.I. No. 1.

## ARGUMENT

## I.      Applicable Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. There Is no Genuine Issue of Material Fact that Ustream Qualifies for Safe Harbor Under the DMCA

### A. Background of DMCA

Congress enacted the DMCA in 1998, in an effort to resolve the unique copyright enforcement problems posed by the widespread use of the internet. *See, e.g., UMG Recordings, Inc. v. Veoh Networks, Inc.*, Nos. 09-55902, 09-56777, 10-55732, 2013 U.S. App. LEXIS 5100 at *13-14 (9th Cir. Cal. Mar. 14, 2013). This effort involved a balancing of the interests of copyright holders, on the one hand, against the interests of two distinct parties: legitimate end-users, who have an interest in not having their material taken down without recourse, and internet service providers ("ISPs"), whose services might be used to commit copyright infringement. *See, e.g., Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004).

Although Congress was aware that the services provided by ISPs such as Ustream are capable of being misused to facilitate copyright infringement, it was "loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions." *UMG Recordings, Inc*, 2013 U.S. App. LEXIS 5100 at *14. In this vein, the DMCA establishes several "safe harbors" that protect eligible service providers from all monetary and most equitable liability that may arise from acts of copyright infringement committed on their website by end-users. Specifically, the DMCA safe harbors provide protection from liability for: 1) transitory digital network communications; 2) system caching; 3) information residing on systems or networks at the direction of users; and 4) information location tools. *See* 17 U.S.C. §§ 512(a)-(d). Although the DMCA safe harbors do not preclude a finding of liability for copyright infringement against qualifying ISPs, they protect these ISPs from all monetary and most equitable relief that may arise from such liability. *See, e.g., Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012)

(upholding district court's determination that a finding of safe harbor application necessarily protects defendant from all affirmative claims for monetary relief).

### B.     Ustream Readily Satisfies the Threshold Eligibility Requirements for Safe Harbor Status

To be eligible for any of the DMCA safe harbors listed in 17 U.S.C. §§ 512(a)-(d), a service provider must meet the following threshold conditions for eligibility: (1) qualify as a "service provider" as that term is defined under 17 U.S.C. § 512(k)(1)(B); (2) demonstrate that it has adopted and reasonably implemented a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers; and (3) prove that it accommodates and does not interfere with standard technical means by which copyright holders may identify protect copyrighted works.  *See, e.g., Obodai v. Demand Media, Inc.,* No. 11 Civ 2503 (PKC), 2012 U.S. Dist. LEXIS 83109, at *7-8 (S.D.N.Y. June 12, 2012) (citing *Viacom Int'l,* 676 F.3d at 27).  Ustream readily satisfies each of these conditions.

### 1.     Ustream's Activities Fall Squarely Within the Broad Scope of "Service Provider," as Defined Under the DMCA

For purposes of the § 512(c) safe harbor, a service provider is defined as "a provider of online services or network access, or the operator of facilities therefor."  *See Viacom Int'l.,* 676 F.3d at 27 (citing 17 U.S.C. § 512(k)(1)(B)).  Courts have repeatedly held that this definition encompasses a wide variety of internet activities including the exact business in which Ustream is engaged.  *See, e.g., Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2011) (finding that defendant service provider, whose website allowed online sharing of photos and videos at the direction of its users, qualified as a "service provider" under § 512(k)(1)(B)); *see also Io Grp., Inc. v. Veoh Networks*, *Inc.*, 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008) (defendant Veoh Networks, a self-described "Internet Television Network" which provided software and a website that enabled sharing of user-provided video content over the internet,

qualified as a "service provider" under 17 U.S.C. § 512(k)(1)(B)); *see also Corbis*, 351 F. Supp. 2d at 1100 (noting the "broad scope" of the definition of "service provider" under 17 U.S.C. § 512(k)(1)(B)).

Ustream's services are much like those provided by the defendants in the above-cited cases, all of which were found to qualify as service providers under 17 U.S.C. § 512(c).  Ustream provides a website that allows its users to stream, share, and comment on user-generated video content.  *See* discussion at pp. 2-4, *supra*.  Therefore there can be no genuine dispute that Ustream qualifies as a "service provider" under the broad definition provided by 17 U.S.C. § 512(k)(1)(B).

### 2. Ustream Has Adopted and Reasonably Implemented a Policy for the Termination in Appropriate Circumstances of Repeat Infringers

Pursuant to 17 U.S.C. § 512(i), to qualify for a safe harbor, a service provider must demonstrate that it has "adopted and reasonably implemented … a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  *See Viacom Int'l*, 676 F.3d at 40 (quoting 17 U.S.C. § 512(i)(1)(A)) (in rejecting plaintiffs' argument that YouTube failed to adopt and reasonably implement a policy under § 512(i), the Court explained that ISPs have no affirmative duty to monitor or police the activities of users).  Because the DMCA does not define "reasonably implemented," federal courts' interpretation of 17 U.S.C. § 512(i) is instructive.  Federal courts in numerous circuits have held that a service provider satisfies the "reasonable implementation" requirement if it has developed a policy under which copyright holders can submit a take-down notice, such policy is available to the public through its website, and the service provider acts to remove infringing content once it receives adequate takedown notices.  *See, e.g., Wolk,* 840 F. Supp. 2d at 744 (granting defendant's motion for summary judgment on safe harbor status, the

Court found that the "reasonable implementation" requirement was satisfied because the evidence established that defendant had developed a copyright policy under which copyright holders could submit takedown notices, that policy was available on its website, and upon receiving DMCA-compliant notices, the defendant removed the identified infringing material); *see also Io Grp.*, 586 F. Supp. 2d at 1143 (granting summary judgment on safe harbor status to defendant Veoh Networks, the Court held that a service provider satisfies the "reasonable implementation" requirement if it "has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications.") (internal citations omitted).

   As in the above-cited cases, now and during all time periods relevant to this lawsuit, Ustream's copyright policy includes a set of instructions to copyright holders (available on Ustream's website) detailing how to submit proper takedown notices, as well as an internal step-by-step procedure for responding to takedown notices and removing infringing material. *See* discussion at pp. 2-4, *supra*. The Copyright Policy available on Ustream's website provides instructions for copyright owners to report alleged copyright infringement, listing the requisite information for a DMCA-compliant notice and directing copyright holders to deliver such notices to Ustream's designated copyright agent. *Id.* Ustream's Content Monitoring Team reviews each incoming notice to make sure that it includes the requisite DMCA information listed in Ustream's Copyright Policy. *Id.* If the notice does not contain the requisite DMCA information, then a member of the Content Monitoring Team promptly responds to the complainant, asking them to supplement their notice with the missing information. *Id.* If the notice *does* contain the requisite information, then Ustream will promptly—often the same day—remove or disable access to the identified infringing channel URL. *Id.* If Ustream receives multiple complaints about a particular

user, then in addition to disabling access to specific channel URLs, in appropriate circumstances it will terminate that user's account entirely. *Id.*

The evidence further establishes that to ensure proper implementation of its vigilant copyright policies, Ustream meticulously records and archives incoming DMCA notices in a database that records the following information for each incident of infringement: the URL and name of the infringing Ustream channel; the user ID associated with the infringing broadcast; the date and time that Ustream removed the infringing content; the length of the broadcast; the viewer count; and the reason for the ban. *See* discussion at pp. 2-4, *supra*. As demonstrated in these tracking logs, it has always been Ustream's policy to respond to DMCA-compliant notices by taking down the identified content within several business days—and frequently on the same day—of receipt. *Id.*

### 3.   Ustream Does Not Interfere with Standard Technical Means by Which Copyright Holders May Identify Protected Copyrighted Works

To satisfy the third and final threshold eligibility requirement for safe harbor status, a service provider must accommodate and not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works. 17 U.S.C. §§ 512(i)(1)(B)-512(i)(2). Such standard technical measures must be developed "pursuant to a broad consensus of copyright owners and services providers in an open, fair, voluntary… process," be "available to any person on reasonable and nondiscriminatory terms," and not "impose substantial costs" on service providers. 17 U.S.C. § 512(i)(2)(A-C). Federal courts have repeatedly held that ISPs are entitled to summary judgment on this safe harbor requirement, unless the plaintiff presents evidence that the ISP actively sought to conceal, delete, or suppress copyright owners' ability to identify protected works. *See, e.g., Wolk,* 840 F. Supp. 2d at 745 (rejecting plaintiff's argument that defendant ISP had interfered with "standard technical measures" by offering editing tools that

allowed its users to hide or crop out copyright watermarks, the Court emphasized the lack of evidence suggesting that the ISP had actively advised or encouraged its users to use such tools); *see also Obodai*, 2012 U.S. Dist. LEXIS 83109, at *13-14 (given that plaintiff himself was able to readily identify the infringing posts by one of defendant service provider's registered users, this was sufficient to demonstrate that defendant did not interfere with standard technical measures).

There can be no dispute that Ustream satisfies this eligibility requirement. As Square Ring itself alleges in the Complaint, the Square Ring "logo is clearly displayed in the screen in which the [allegedly] Copyrighted Broadcast is exhibited." D.I. 1 at ¶ 32. Indeed, Square Ring's monitoring agent, NetResult, was able to readily identify the channel names and URLs of the three purportedly infringing streams on the day that they were broadcast. *See* Tran Decl. at ¶ 7. As in the above-cited cases, there is no evidence that Ustream ever attempted to conceal, delete, or suppress Square Ring's identifying information. Nor is there any evidence that Ustream ever "advised or encouraged" its users to conceal a copyrighted work's status. *See, e.g., Wolk,* 840 F. Supp. 2d at 745; *Obodai*, 2012 U.S. Dist. LEXIS 83109, at *13-14. Accordingly, there can be no dispute that Ustream satisfies this final condition for eligibility.

### C.      Ustream Is Sheltered from Liability Under 17 U.S.C. 512(c)

Once the threshold eligibility requirements have been met, a service provider must then satisfy the specific requirements for the applicable safe harbor provision. Here, Ustream is entitled to safe harbor protection under 17 U.S.C. § 512(c), which protects service providers from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." *See also UMG Recordings, Inc*, 2013 U.S. App. LEXIS 5100 at *31-32. Ustream readily satisfies the three conditions for liability protection set forth in § 512(c)(1)(A)-(C).

### 1.  Prior to March 21, 20009, Ustream Did Not Have the Requisite Actual or Apparent Knowledge of the Disputed Broadcasts

Under 512(c)(1)(A)(i)-(ii), a service provider qualifies for safe harbor protection if it has

no actual knowledge that the material or an infringing activity using the material on the system is

infringing or, in the absence of such knowledge, is not aware of facts or circumstances from

which infringing activity is apparent.  In determining whether a defendant had actual knowledge

or sufficient awareness of facts and circumstances from which infringing activity was apparent,

the Court may only consider notices relating to the *specific copyrighted work(s) in dispute*.

*See, e.g., Obodai*, 2012 U.S. Dist. LEXIS 83109, at *15-18 (granting defendant's motion for

summary judgment on safe harbor status and explaining that while "safe harbor might not apply

if the defendant had knowledge that the *specific works in dispute* were infringing, … knowledge

or suspicion of *broader infringement*" does not qualify as knowledge under 512(c)(1)(A)(i)-(ii))

(emphasis added) (citing *Viacom Int'l*, 676 F.3d at 32-34); *see also Corbis*, 351 F. Supp. 2d at

1107-1108 (evidence that defendant Amazon had received past DMCA notices from third parties

addressing copyrighted photos was insufficient to create a material issue of fact to overcome

summary judgment, because "the issue is not whether Amazon had a general awareness that a

particular type of item might be infringed," but "whether Amazon actually knew that specific

[Amazon users] were selling items that infringed [plaintiff's] copyrights."); *see also UMG*

*Recordings, Inc.*, 2013 U.S. App. LEXIS 5100 at *44-46.

Furthermore, even notices that pertain to the specific copyrighted works in dispute cannot

be used to impute knowledge to a service provider unless such notices substantially comply with

the DMCA notice requirements listed in 512(c)(3)(A).  In other words, "a notification from a

copyright owner that fails to comply substantially with Sections 512(c)(A)(ii), (iii), or (iv) 'shall

not be considered … in determining whether a service provider has actual knowledge or is aware

13

of the facts or circumstances from which infringing activity is apparent.'" *Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1092-93 (C.D. Cal. 2001) (citing 17 U.S.C. § 512(c)(3)(B)(i)-(ii)); *see also Wolk*, 840 F. Supp. 2d at 746-747 (notices not identifying specific location of alleged infringement insufficient to confer "actual knowledge" on service provider); *see also UMG Recordings, Inc.*, 2013 U.S. App. LEXIS 5100 at *46-47 (deficient notice "shall not be considered under [§ 512(c)(1)(A)] in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent") (citation omitted).

In this case, Ustream had neither actual nor apparent knowledge of the three purportedly infringing streams, until, at the earliest, March 21, 2009—when it received the notices from Square Ring's monitoring agent, NetResult, identifying the names and URLs of the streaming channels.  *See* Tran Dec. at ¶¶ 6-7.  The four emails from Square Ring to Ustream predating March 21 (see discussion at pp. 5-6, *supra*) do not constitute DMCA-compliant notices under 17 U.S.C. § 512(c)(3)(A)(i)-(vi).  *Id*.  None identified any existing copyrighted work, let alone one that had been infringed.  *See* § 512(c)(3)(A)(ii)).  There was also no identification of infringing material or activity to be removed or disabled, and thus Ustream could not have located any such infringing material or activity.  *See* § 512(c)(3)(A)(iii).  They also contained no statements of good faith belief that the information in the notifications was accurate, or statements of authorization under penalty of perjury.  *See* § 512(c)(3)(A)(v),(vi); *see also Wolk*, 840 F. Supp. 2d at 746 (describing six elements for notice to be DMCA-compliant) (citations omitted); *Hendrickson*, 165 F. Supp. 2d at 1089 (pre-suit cease and desist letter and emails lacking key elements rendered notification deficient).

Given the extensive deficiencies in each of the four notices predating March 21, and considering that Square Ring cannot satisfy the DMCA's stringent notice and takedown

14

procedures by cobbling together separately defective notices, knowledge of the allegedly

infringing broadcasts may not be imputed to Ustream prior to March 21, 2009.  *See, e.g.,*

*Hendrickson*, 165 F. Supp. 2d at 1090-92.

> **2.**      **Once Ustream Obtained Requisite Knowledge of the Allegedly Infringing Broadcasts, it Acted Expeditiously to Remove the Material.**

Under 17 U.S.C. 512(c)(1)(A)(iii) and 512(c)(1)(C), a service provider that obtains actual

or constructive knowledge of the alleged infringement will still be entitled to safe harbor status,

so long as it acts expeditiously to remove the allegedly infringing material.  The DMCA does not

define "expeditiously," but courts interpreting this term have held that a defendant who responds

to DMCA complaints within a few days has satisfied its obligations under the DMCA.  *See, e.g.,*

*Io Grp.*, 586 F. Supp. 2d at 1150 (defendant's policy of responding to and removing noticed

content as necessary on the same day the notice was received or within a few days thereafter

sufficient under 512(c)(1)(A) analysis); *see also Corbis*, 351 F. Supp. 2d at 1109 (Amazon's

unchallenged assertion that it promptly cancels a listing after receiving notice of infringement

sufficient to support grant of summary judgment on its safe harbor status).

As discussed above, Square Ring did not provide Ustream with effective DMCA notices

until Saturday, March 21.  The indisputable evidence demonstrates that, pursuant to Ustream's

practice of responding to DMCA-compliant notices within several business days (*see* discussion at

pp. 3-4, *supra*), Ustream took steps to remove the identified content, and responded to Square

Ring's monitoring agent explaining those steps, all within 48 hours of receiving the March 21

DMCA notices.  *See* discussion at pp. 5-6, *supra*.  No court has ever held that such a response time

fails to qualify as "expeditious" under the DMCA; to the contrary, to the extent federal courts have

addressed this issue at all, they have uniformly held that response times similar to Ustream's

will satisfy the "expeditious" requirement under 17 U.S.C. 512(c)(1)(A)(iii) and 512(c)(1)(C).

*See, e.g., Io Grp.*, 586 F. Supp. 2d at 1150; *see also Corbis*, 351 F. Supp. 2d at 1109.

###### 3. Ustream Satisfies the Requirements of 512(c)(1)(B) Because it Does Not Have the Requisite "Right and Ability to Control" Online Content Generated by its Users.

17 U.S.C. § 512(c)(1)(B) provides that a service provider is entitled to safe harbor so long as it does not have the "right and ability to control" or, if it does, that it does not receive "direct financial benefit from the alleged infringing activity." 17 U.S.C. § 512(c)(1)(B). Importantly, the fact that the service provider has a right to take down or block access to user-generated materials available on its website is insufficient to establish a "right and ability to control" under the DMCA. *See UMG Recordings, Inc.,* 2013 U.S. App. LEXIS 5100 at *41-42 ("the DMCA recognizes that service providers who are not able to locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection"); *Wolk*, 840 F. Supp. 2d at 748; *see also Hendrickson*, 165 F. Supp. 2d at 1093 (to hold otherwise "would defeat the purpose of the DMCA and render the statute internally consistent.") Rather, to establish that a service provider has the requisite "right and ability to control" for purposes of § 512(c)(1)(B), the plaintiff must demonstrate that the service provider prescreened content, rendered extensive advice to users regarding content, and edited user content. *See Wolk*, 840 F. Supp. 2d at 748. Here, Ustream did not review, approve, select or upload the streams of the March 21 Broadcast. *See* Tran Decl. at ¶ 7. Indeed, given that its many users broadcast approximately 1,573,253 live streams and 768,702 recorded broadcasts per month on Ustream's website, "no reasonable juror could conclude that a comprehensive review of every file would be feasible." *See Wolk*, 840 F. Supp. 2d at 748. Because there can be no dispute that Ustream does not have the right and ability to control the infringing material, it is not necessary for this Court to inquire as to whether Ustream

receives a direct financial benefit from the allegedly infringing conduct.  *See, e.g.*, *Corbis*, 351 F. Supp. 2d at 1110.

### III.     The Limited Injunctive Relief Provided under the DMCA Is Moot.

Because Ustream is entitled as a matter of law to safe harbor status under 17 U.S.C. § 512(c), the only relief available to Square Ring for its copyright infringement claims is the limited injunctive relief under section 512(j).  *See, e.g.*, *Io Grp.*, 586 F. Supp. 2d at 1154-55.  The two specific forms of injunctive relief listed in section 512(j) are an order restraining the service provider from providing access to infringing material at a particular website location and/or an order restraining the service provider from providing access to a subscriber or account holder who is engaging in infringing activity.  Both forms of relief would be moot in this case, because by March 23, 2009, Ustream had already removed the content on the three infringing channels, to the extent it was even still available on Ustream's website.  Tran Decl. at ¶ 7.

## CONCLUSION

Based upon the foregoing, Defendant Ustream respectfully requests that the Court grant its motion for summary judgment that it is entitled to "safe harbor" status under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

WHEREFORE , Defendant Ustream respectfully requests that this Court enter an Order granting Ustream's Motion for Summary Judgment.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ David E. Moore*

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

Rodger R. Cole
Songmee Connolly
Elizabeth J. White
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500

Dated:  July 31, 2013
1117060 / 35415

*Attorneys for Defendant Ustream.TV, Inc.,*
*a/k/a, Ustream.TV.com, a/k/a Ustream*

18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on July 31, 2013, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on July 31, 2013, the attached document was electronically mailed to the following person(s)

Michael G. Rushe
Hudson, Jones, Jaywork & Fisher, LLC
225 South State Street
Dover, DE 19901
mrushe@delawarelaw.com

Pamela Cocalas Wirt
John S. Wirt
Wirt & Wirt, P.C.
770 Bryant Avenue
Winnetka, IL 60093
pcwirt@wirtlawfirm.com
jwirt@wirtlawfirm.com

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

957067 / 35415