## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------)
SQUARE RING, INC.,                                         )
                                                           )
                                 Plaintiff,                )
      -against-                                            )
                                                           )
                                                           )
                                                           )
JOHN DOE-1, CHIEF EXECUTIVE OFFICER,                       )
JOHN DOE-2, CHIEF TECHNICAL OFFICER,                       )
 JOHN DOE-3, PRESIDENT, JOHN DOES 4-10,                    )
Individually and as officers, directors, shareholders      )     Civil Action No. 09-563-GMS
and/or principals of USTREAM.TV, INC., a/k/a               )
USTREAM.TV.COM, a/k/a USTREAM,                             )     REDACTED VERSION
                                                           )
and                                                        )
                                                           )
USTREAM.TV, INC., a/k/a, USTREAM.TV.COM,)
a/k/a USTREAM,                                             )
                                                           )
                                 Defendants.               )
-----------------------------------------------------------)
```

### PLAINTIFF SQUARE RING, INC.'S BRIEF IN OPPOSITION TO DEFENDANT USTREAM'S MOTION FOR SUMMARY JUDGMENT THAT IT IS ENTITLED TO "SAFE HARBOR" STATUS UNDER THE DMCA, 17 U.S.C. §512

OF COUNSEL:

Pamela Cocalas Wirt
John S. Wirt
WIRT & WIRT, P.C.
770 Bryant Avenue
Winnetka, IL 60093
Tel: (847) 323-4082

Dated: April 10, 2014

Michael G. Rushe (#4959)
HUDSON, JONES, JAYWORK & FISHER
225 South State Street
Dover, DE 19901
Tel.: (302) 734-7401
mrushe@delawarelaw.com

*Attorneys for Plaintiff Square Ring, Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT............................................................................ 1

STATEMENT OF RELEVANT FACTS............................................................ 2

ARGUMENT....................................................................................................... 6

I.    Introduction............................................................................................ 6

II.    Standard of Review................................................................................ 6

III.   There Are Genuine Issues of Material Fact that Preclude
Summary Judgment................................................................................ 7

      A.    Congress Contemplated Cooperation Between ISPs and
Copyright Holders in Combatting Piracy...................................... 7

      B.    Live Broadcast Exemption Pre-Event Notice.............................. 10

      C.    A Reasonable Juror Could Conclude That Ustream Was Aware
of Facts or Circumstances From Which Infringing Activity
Was Apparent............................................................................ 12

      D.    A Reasonable Juror Could Conclude That Ustream (i) did not
Act Expeditiously Under the Circumstances and (ii) Did Not
Remove or Disable Access to the "Material"............................. 17

          i.    Failure to Act "Expeditiously".......................................... 17

          ii.    Failure to Remove the "Material"...................................... 19

i

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*ALS Scan v. Remarq Communities,*
239 F.3d 619 (4th Cir., 2000)........................................................ 8, 9, 14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..................................................................... 6, 7

*Capitol Records, Inc. v. MP3tunes,*
2013 WL 1987225 (S.D.N.Y. May 14, 2013)............................... 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).................................................................... 6

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013)..................................................... 16

*Costar Group Inc. v. Loopnet, Inc.,*
164 F.Supp.2d 688 (D. Md., 2001)............................................. 18

*The Football Ass'n Premier League v. YouTube, Inc.,*
633 F.Supp.2d 159 (S.D.N.Y., 2009)........................................ 11

*Gill v. Rollins Protective Servs. Co.,*
773 F.2d 592 (4th Cir.1985)....................................................... 7

*Hendrickson v. Ebay, Inc.,*
165 F.Supp.2d 1082 (C.D. Cal., 2001)....................................... 20

*Io Group, Inc. v. Veoh Networks, Inc.,*
586 F.Supp.2d 1132 (N.D. Cal., 2008)....................................... 7

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
545 U.S. 913 (2005)................................................................... 16

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
213 F.Supp.2d 1146 (C.D. Cal., 2002)....................................... 7, 20

*Perfect 10, Inc. v. Google, Inc.,*
No. CV 04-9484 (Bankr.C.D.Cal., 2010).................................... 18

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
718 F.3d 1006 (9th Cir., 2013).................................................. 7

*UMG Recordings, Inc. v. Veoh Networks Inc.,*
665 F.Supp.2d 1099 (C.D. Cal., 2009)....................................... 7

*United States v. Diebold, Inc.,*
369 U.S. 654 (1962).................................................................. 7

**STATUTES AND AUTHORITIES**

17 U.S.C. §411................................................................................ *passim*
17 U.S.C. §512................................................................................ *passim*
House Committee on the Judiciary Report, H.R.Rep. No. 94-1476 (1976)............................ 11
House Committee on Commerce Report, H.R.Rep. No. 105-551, pt. 2 (1998).................... 7, 13, 14
Joint Explanatory Statement of the Committee of Conference,
H.R. Rep. No. 105-796, 105th Cong., 2d Sess. (1998)............................... 8, 14
Senate Committee on the Judiciary Report, S.Rep. No. 105-190 (1998)................................ 7, 18
*Piracy of Live Sports Broadcasting Over the Internet,* Hr'g Bef. the Comm. on the Jud. H.R.
(Dec. 16, 2009) Ser. No. 111-94........................................................ 8, 9, 15

ii

## PRELIMINARY STATEMENT

Plaintiff Square Ring, Inc. ("SRI") gave Defendant Ustream, Inc. ("Ustream") seven (7) notices of copyright infringement of its March 2009 Event, four of which were received by Ustream prior to the event being broadcast, and three of which were received by Ustream while the event was being broadcast. Ustream admits that the three notices it received while the event was being broadcast complied with the DMCA, but argues that it is nonetheless entitled to safe harbor protection because two days after the event, Ustream "disabled the three **channels** that **had** broadcast the March 21 Broadcast,"[1] and thus, Ustream alleges, it satisfied its obligation under 17 U.S.C. 512(c)(1)(C) to "respond[] expeditiously to remove, or disable access to, **the material**."

Because SRI's event was streamed live on Ustream,[2] Ustream's response to SRI's DMCA notices, by disabling two days later the channels that "had" broadcast the event, did not remove or disable access to the "material," i.e., SRI's pirated broadcast. Instead of responding to SRI's legitimate requests for cooperation, Ustream made the conscious decision not to cooperate with SRI, and now attempts to immunize itself from liability under the DMCA by arguing that the post-broadcast disabling of the users' channels is the functional equivalent of removing

---

[1] *Declaration of Suzanne Tran* ¶ *7* (D.I. 102) ("Tran Dec.").

[2] Live streaming content does not reside permanently on a website but is streamed and once the stream is over, the content is no longer accessible by viewers. When Congress enacted the DMCA in 1998, however, it was the proverbial YouTube's of the world that Congress was concerned with. Streaming sites such as Ustream did not exist. YouTube-like content resides permanently on servers and can be accessed over and over by viewers until either removed by the uploading user or YouTube. To remove or disable access to "material" that is being streamed, removal must be done while the stream is being broadcast.

infringing material.

If Ustream's conduct is covered by the DMCA safe harbor, it could spell disaster for the PPV industry in the United States. Anyone with limited technical ability would be able to set up an Internet streaming website and knowingly let users upload PPV events (even after receiving pre-event notices from the copyright owners) and so long as the website disabled these users' channels within a couple of days after receiving a DMCA notice, the website would be shielded from liability. Yet the website would be able to generate enormous traffic and it would be able to run advertising around the illegal but immune live PPV streams. We believe that Congress never intended this result when it enacted the DMCA and because the plain language of the statute requires the website to take the affirmative steps to actually remove or disable access to the "material," a live streaming site that does not remove the material but only shuts down a user's channel after-the-fact has not complied with the plain language of the statute and is therefore not entitled to the safe harbor, especially when it was well within the technical capacity of the website to actually remove the illegal material having been given prior advance notice.

## STATEMENT OF RELEVANT FACTS

SRI has been in business since 1989 and is a promoter of boxing and mixed martial arts ("MMA") events. Ustream is a live streaming website formed in 2007 and was "originally created to connect military service members to family and friends across the world. Since then, the company has established itself as a socially fueled video platform for broadcasters of any size to easily reach an infinite audience and share experiences in real-time."[3]

On November 8, 2008, SRI promoted a fight on HBO PPV at Madison Square Garden

---

[3]   *Declaration of John S. Wirt* ("Wirt Dec.") ¶3.

between Roy Jones, Jr. and Joe Calzaghe (the "November 2008 Event"). In the weeks leading up to the promotion, SRI learned of a company in the UK, NetResult, which monitored the Internet for illegal streams of PPV events and SRI had some preliminary discussions with NetResult about their services. After the November 2008 Event, SRI was given a copy of a report NetResult prepared showing the illegal streams of the November 2008 Event, including illegal streams of that event by Ustream. *Wirt Dec. ¶4.*

The next PPV event that SRI promoted was a boxing and MMA event (the "March 2009 Event") on March 21, 2009 at the Pensacola Civic Center. In late January 2009, SRI entered into an agreement with Secondsout.com and Maxboxing.com to stream the March 2009 Event live on PPV over the Internet. This Internet PPV distribution was to be in addition to the traditional cable and satellite PPV distribution SRI was already planning. *Wirt Dec. ¶5.*

To combat Internet piracy, SRI decided to engage NetResult for the March 2009 Event. Given the level of illegal piracy that SRI was aware of taking place on Ustream, SRI believed that it was a virtual certainty that the March 2009 Event would be illegally streamed on Ustream. Accordingly, SRI instructed its piracy lawyers to put Ustream on notice ahead of the March 2009 Event and to request from Ustream its cooperation and assistance in combatting the anticipated illegal Internet piracy that was virtually certain to occur on Ustream. The cooperation requested was either (i) a takedown tool (i.e., the ability of SRI on its own to delete from the Ustream website the illegal streams of the event as they were discovered) or (ii) a contact at Ustream who SRI could call as the illegal streams were discovered so that Ustream could then delete them. *Wirt Dec. ¶6.*

From March 17, 2009 to March 20, 2009, SRI's piracy attorneys sent a total of four (4)

3

notices to Ustream regarding the upcoming March 2009 Event and requested its cooperation and assistance. They also provided evidence of the November 2008 Event that had been illegally streamed on Ustream as a basis for requesting Ustream's cooperation. *Wirt Dec. ¶7.*

Instead of cooperating with SRI's reasonable requests for assistance, Ustream ignored them. It never responded to SRI's requests for a contact name or a takedown tool. Rather, in response to SRI's notices, Ustream first requested that SRI provide the "specific channel information and/or include the channel URL." When SRI responded that the "event of March 21st, 2009 will be a live Boxing and MMA event" and thus it was not possible to provide Ustream with specific channel information or URLs as the event was not being streamed yet, Ustream then replied that "we have expeditiously removed or disabled access to the material identified in your message." *Wirt Dec. ¶8.*

This did not make sense because the event was not yet taking place and therefore there was nothing to remove or disable. In response, SRI's attorneys stated that while they appreciated Ustream's "acknowledgment of the need to remove all property of my client from your website, [u]fortunately, this does little to combat our desire to ensure that no infringing showing occur on or after March 21st, 2009" and they again requested a takedown tool or "immediate access to a contact at your company who will be made available on March 21st." *Wirt Dec. ¶9.*

Ustream did not respond to this third notice which led to the fourth and final advance notice request from SRI for assistance to deal with the "pending infringement" and again requesting a takedown tool or "appropriate staffing with the ability to simultaneously remove infringing content from your site." Ustream did not respond to this notice. *Wirt Dec. ¶10.*

While the live March 2009 Event was actually taking place, SRI's agent, NetResult, sent

4

three additional notices to Ustream on March 21, 2009 at 6:26 p.m., 7:13 p.m. and 9:33 p.m. (PST) providing Ustream with detailed information regarding three channels that were actually illegally streaming the March 2009 Event. *Tran Dec. ¶7.* Ustream has admitted that these notices complied with the DMCA. (D.I. 101 at 14).

Ustream did not remove or disable access to SRI's copyrighted broadcast. Instead, on March 23, 2009, two days after the March 2009 Event was no longer being streamed and was not even capable of being viewed on Ustream's website, Ustream "disabled the three channels that had broadcast the March 21 Broadcast." *Tran. Dec. ¶7.*

Based on an analysis of the information provided by NetResult and records obtained by SRI from Ustream in discovery, there were ███████████████ views of the March 2009 Event on the three channels which Ustream illegally distributed. *Wirt Dec. ¶13.*

Ustream knew that its website was being used to distribute illegal streams of PPV and CCTV events. To date, Ustream has not implemented a policy of limiting the number of viewers that can watch a particular stream, like other streaming websites have done. *Wirt Dec. ¶17.* Instead, Ustream has promoted its website as one where users can "easily reach an infinite audience."

Ustream, knowing that its website was being used by others to illegally stream PPV events, developed its own PPV business model where it is not merely a passive intermediary between users uploading and viewers watching content, but rather is itself actively engaged as a competitor in the distribution of boxing and MMA PPV events for profit. *Wirt Dec. ¶14.*

## ARGUMENT

### I.     Introduction.

SRI's complaint contains eight separate counts: (I) Direct Copyright Infringement; (II) Contributory Copyright Infringement; (III) Vicarious Copyright Infringement; (IV) Inducement of Copyright Infringement; (V) Common Law Trademark Infringement; (VI) Common Law Contributory Trademark Infringement; (VII) Common Law Vicarious Trademark Infringement; and (VIII) Common Law Inducement of Trademark Infringement. In its Motion for Summary Judgment, Ustream requests that the Court find that Ustream is entitled to "safe harbor" status under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §512 and that Ustream is protected from any monetary liability arising from SRI's copyright infringement claims. Ustream's motion does not address SRI's trademark claims (Counts V through VIII) and Ustream has thus waived its rights to move for summary judgment with respect to such claims.[4]

### II.    Standard of Review.

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. *Anderson*, 477 U.S. at 256.

When ruling on a motion for summary judgment, the court must construe the facts

---

[4]    *See*, D.I. 63, ¶ 6.

alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.1985).

The party seeking immunity under the safe harbor provisions of the DMCA has the burden to show that it has satisfied the necessary conditions entitling it to safe harbor. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1154 (N.D. Cal., 2008) (Defendant "has met its burden in establishing its entitlement to safe harbor for the alleged infringements here"); *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F.Supp.2d 1099, 1107 (C.D. Cal., 2009) (Defendant "has met its burden of proving compliance with section 512(c)").

**III.    There Are Genuine Issues of Material Fact that Preclude Summary Judgment.**

   **A.    <u>Congress Contemplated Cooperation Between ISPs and Copyright Holders in Combatting Piracy.</u>**

While Congress created the DMCA as a balance between the interests of copyright holders in their property and the substantial socially beneficial functions being developed through the Internet, it is also clear that Congress enacted the DMCA "to foster **cooperation** among copyright holders and service providers in dealing with infringement on the Internet. *See* S.Rep. No. 105–190, at 20 (noting OCILLA was intended to provide 'strong incentives for service providers and copyright owners **to cooperate** to detect and deal with copyright infringements'); H.R.Rep. No. 105–551, pt. 2, at 49 (1998) (same)." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021-22 (9th Cir., 2013); *see also, Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1178 (C.D. Cal., 2002) ("online service

7

providers are meant **to have strong incentives to work with** copyright holders. The possible loss of the safe harbor provides that incentive and furthers a regulatory scheme in which courts are meant to play a secondary role to self-regulation.").

The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe. *ALS Scan v. Remarq Communities*, 239 F.3d 619, 625 (4th Cir., 2000). At that point, the DMCA shifts responsibility to the service provider to disable the infringing matter, "preserv[ing] the strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Conf. Rep. No. 105-796, at 72 (1998).

One development that concerned Congress since the DMCA was enacted in 1998, as the Internet matured and broadband capacity became more prevalent, is the ability to stream live sporting events over the Internet. In his testimony in the hearing on "Piracy of Live Sports Broadcasting Over the Internet" before the Committee on the Judiciary of the House of Representatives on December 16, 2009 (the "Live Sports Piracy Hearing"), Ed Durso, Executive Vice President of ESPN, Inc. stated,

> there exist an increasing number of Internet sites that enable the theft of live sports programming. Sites like JustinTV, UstreamTV, LiveStream . . . , for example, regularly make available real time streaming of live sports programming, uploaded we believe either directly or by the users of these sites.

*p. 38, Live Sports Piracy Hearing, Serial No. 111-94.* Similarly, Lorenzo Fertita, CEO of the UFC, testified that,

8

> many of these new websites are making fortunes by aiding in the theft of our content and making it available through their web sites. While these sites purport to be a [forum] for users who share their own original user generated video content, they cannot deny that watching a live Pee Wee football game will not generate much, if any, viewer interest. Certainly it would not drive enough traffic to rate a viable business based on an advertising revenue model. The truth is that most of the content that is generating any real traffic consists of infringing streams of copyrighted works.

*Id., p. 13.*

As one of the most blatant infringers of PPV events on the Internet, Ustream's conduct in this case has not surprisingly been the very antithesis of cooperation that Congress envisioned when it enacted the DMCA. Ustream all but ignored SRI's attempts to work with and cooperate with Ustream during the week leading up to its March 2009 Event. No response was ever provided to SRI's requests for a contact at Ustream or a takedown tool. A simple Google search of "Jones vs. Sheika" would have exposed the illegal streams while they were happening, as SRI's agent, NetResult, was able to find, and as the thousands of Ustream users were also easily able to find in order to illegally watch the streams. Ustream could have easily found these illegal streams and with the click of a button removed them. Ustream didn't even try.

Ustream argues that SRI's four (4) pre-event notices were defective under the DMCA because SRI did not provide a URL. However, 17 U.S.C. 512(c)(3)(A)(iii) does not require that a URL be provided but only "information reasonably sufficient to permit the service provider to locate the material." *See also, ALS Scan v. Remarq Communities,* 239 F.3d 619, 625 (4th Cir., 2000) (letter providing notice equivalent to a list of representative works that can be easily identified by the service provider substantially complies with the notification requirements).

9

SRI's broadcast was not some obscure program that would have been difficult to find, but a nationally televised PPV event that was available via cable and satellite in approximately 65 million homes in the United States. The information that SRI provided in the four (4) pre-event advance notices was more than sufficient to permit Ustream to locate the illegal streams if it had simply bothered to type in "Jones vs. Sheika" in its own search bar on its website. Ustream's lack of cooperation and its refusal to provide SRI with any assistance whatsoever, particularly after SRI sent Ustream evidence of SRI's November 2008 Event being illegally streamed on Ustream, should be taken into consideration when deciding whether Ustream acted reasonably and complied with the requirements to qualify for the safe harbor.

**B.     Live Broadcast Exemption Pre-Event Notice.**

Ustream has failed to address the fact that 17 U.S.C. §411(c) permits copyright holders to provide advance copyright infringement notice for live broadcasts. Specifically, 17 U.S.C. §411(c) [formerly, 411(b)] provides that,

> [i]n the case of a work consisting of **sounds, images, or both, the first fixation of which is made simultaneously with its transmission,** the copyright owner may, **either before or after** such fixation takes place, institute an action for infringement under section 501, fully subject to the remedies provided by sections 502 through 505 and section 510, if, in accordance with requirements that the Register of Copyrights shall prescribe by regulation, the copyright owner—
>
> > (1) serves notice upon the infringer, **not less than 48 hours before such fixation,** identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work; and
> >
> > (2) makes registration for the work, if required by

10

subsection (a), within three months after its first
transmission.

(Emphasis supplied).   This provision, known as the "live broadcast exemption," permits

copyright owners to provide advance notice to infringers that differs from the takedown notice

required by the DMCA.   "Section 411(b) [currently 411(c)] is intended to deal with the special

situation presented by works that are being transmitted 'live' at the same time they are being

fixed in tangible form for the first time," H.R.Rep. No. 94-1476, at 157.   Under the "live

broadcast exemption," a copyright owner of a live broadcast is permitted to institute an action for

copyright infringement under section 501 fully subject to the remedies of sections 502 through

505 and section 510 either before or after the copyright comes into existence, i.e., upon its

"fixation."   *See, The Football Ass'n Premier League v. YouTube, Inc.*, 633 F.Supp.2d 159

(S.D.N.Y., 2009) (website's motion to dismiss denied insofar as it sought dismissal of copyright

owner's claims for statutory damages arising from the infringement of works which qualify

under the "live broadcast exemption" in Section 411(c)). The March 2009 Event was a live audio

visual broadcast, and SRI's first pre-event advance notice to Ustream dated March 17, 2009 (*Ex.

C, Wirt Dec.*) complied with 17 U.S.C. 411(c) because it was received by Ustream more than 48

hours prior to the March 2009 Event, it identified the work, put Ustream on notice that "Jones vs.

Sheika – Boxing and MMA" would be broadcast "on March 21, 2009," and notified Ustream

that SRI would be the "copyright owner and publisher" and that event was "scheduled to be

transmitted in a pay-per-view format," although the notice did contain an immaterial typo in

referring to the live broadcast exemption statute ("441" as opposed to "411" and it referenced its

former paragraph "(b)" designation).

More importantly, even assuming, *arguendo,* that this pre-advance notice did not comply

11

with the DMCA because it did not provide a URL, the notice did comply with 17 U.S.C. 441(c) and thus SRI could have, for example, instituted litigation against Ustream prior to the March 2009 Event to obtain an injunction against Ustream from broadcasting the March 2009 Event in accordance with this provision and in that case, Ustream would have had to monitor its website for illegal streams of the March 2009 Event without having the benefit of a URL that Ustream claims it is entitled to under the DMCA.

By intentionally leaving the "live broadcast exemption" in place when Congress enacted the DMCA at a time when the streaming of live sporting events was not even a practical possibility, it is clear that that the rights copyright holders have in live broadcasts under 17 U.S.C. 441(c) were not intended to be abrogated by the DMCA.   Ustream's attempt to use the safe harbor provisions in 17 U.S.C. 512 to immunize itself from liability for a live broadcast would eviscerate the notification scheme and remedial provisions Congress left in place for this very special situation and should be rejected.

C.     **A Reasonable Juror Could Conclude That Ustream Was Aware of Facts or Circumstances From Which Infringing Activity Was Apparent.**

It was common knowledge in the boxing and MMA industries in 2008 and 2009 that if someone wanted to see a boxing or MMA PPV event for free, that person most likely could find the event being streamed on Ustream. During this time period, Ustream was considered one of the most blatant infringers of PPV events. *Declaration of Donna K. Westrich ("Westrich Dec.")* ¶3.   It simply belies credibility that Ustream was not aware of the massive and blatant infringement taking place on its website. Indeed, the level of network traffic is one of the most closely monitored and touted statistics by a start-up to potential financial investors.

In the past, Ustream promoted its website as one where broadcasters of any size can

12

"easily reach an infinite audience," although it has since stopped promoting this feature on its website. Ustream never implemented, as other live streaming sites have done, a policy of "strict limits on the number of viewers that can see a particular stream," (H.Rep. 105-551 at 13), at least until such time as the content could be verified to be not infringing. (see e.g., http://www.livestream.com/support/faq limiting "unverified" free Livestream channels to 50 concurrent views). Instead, Ustream intentionally left in place technology which it knew was being used illegally to infringe the rights of others on a massive basis. For example, on May 2, 2009, the Manny Pacquiao vs. Ricky Hatton fight was illegally streamed on Ustream to over 130,000 concurrent viewers, representing lost PPV revenue of over $6,500,000. *Wirt Dec. ¶¶3, 17 and 22.*

According to documents produced by Ustream in discovery which it has classified as Highly Confidential, Attorneys Eyes Only,



*Wirt Dec. ¶16.*

In addition to being a service provider, Ustream is actively engaged as a competitor in the distribution of boxing and MMA PPV events for profit, like HBO PPV, iNDemand and cable and satellite systems. It licenses content from others and then distributes this content over its system, collecting revenue from PPV subscribers and then allocating and distributing this

13

revenue to its licensors. *Wirt Dec. ¶19.* These activities fall outside the definition of a service provider in 17 U.S.C. 512(k)(1)(B) and thus Ustream has taken on dual capacities, both as a service provider and as a PPV distributor. "The DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for "passive," "automatic" actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider. H.R. Conf. Rep. No. 105-796, at 72 (1998), reprinted in 1998 U.S.C.C.A.N. 649; H.R. Rep. No. 105-551(I), at 11 (1998)," *ALS Scan v. Remarq Communities*, 239 F.3d 619, 625 (4th Cir., 2000). By taking on the additional role of PPV distributor and using its own "passive" system to distribute the PPV content which it licenses, Ustream is not merely a neutral technology company connecting family and friends to each other across the world and cannot now immunize itself from liability under the DMCA when it has taken on a much more expansive role than the one intended by Congress when it created the safe harbor for passive service providers.

It is well known in the boxing and MMA industries that if Ustream is itself involved in distributing a boxing or MMA event via PPV on Ustream's website through a license from a promoter, that promoter is virtually guaranteed that there will be no competing illegal streams on Ustream's website as Ustream will actively monitor and take down any such illegal streams. *Westrich Dec. ¶6.*

The UFC is a case in point in how Ustream has knowingly used the rampant PPV infringement on its own site to further its own PPV business agenda. In 2008 and 2009, Ustream was also known as one of the most blatant infringers of UFC fights. *Westrich Dec. ¶3.*

14

According to Ustream's discovery, ██████████████████████████

██████████████████████████ *Wirt Dec. ¶18.* In August 2009, about a month after

this lawsuit was filed, Ustream had developed and began offering copyright holders a takedown

tool so they could remove illegal content which they discovered themselves. *Id.* In December

2009, in his testimony before Congress, the UFC's CEO, Lorenzo Fertitta, stated,

> [s]ome of these websites perfunctorily offer tools to copyright
> owners to engage in self-help take-downs. However, they have
> **deliberately attracted users** by allowing and inducing users to
> upload infringing works, thereby drawing traffic to their website.
> This has enabled some to gain a commanding market share, earn
> significant advertising revenues, and presumably increase their
> enterprise value.
>
> I submit that they have deliberately chosen not to take reasonable
> precautions to deter the rampant infringement on their sites
> because they directly profit from the availability of popular
> infringing streams on those sites.[5]

The UFC subpoenaed Ustream for the identities of users that uploaded its PPV events in July

2010, but it was not long after Mr. Fertitta uttered these prophetic words that the UFC realized

that it was better to join Ustream and permit it to lawfully distribute the UFC's events on a PPV

basis (and at least be assured that Ustream would itself monitor its own site to remove all the

rampant illegal streams as Ustream would now have an interest in the PPV revenue). *Wirt Dec.*

*¶18.* In other words, in order to attract legitimate PPV business, Ustream knowingly turned a

blind eye to the blatant and massive copyright infringement taking place on its website with

respect to companies that were not its clients, but for those that signed up with Ustream, they

were virtually guaranteed that there would be no competing illegal streams on Ustream's website

---

[5]   (Emphasis supplied).  "Piracy of Live Sports Broadcasting Over the Internet," Hearing
Before the Committee on the Judiciary House of Representatives, December 16, 2009, Serial No.
111-94, pp. 21-22, http://judiciary.house.gov/hearings/printers/111th/111-94_54075.PDF

as Ustream would actively monitor and take down those illegal streams.

Ustream has cited cases that hold that with respect to an otherwise innocent service provider, only upon such service provider's obtaining knowledge of the specific works in dispute is the provider's duty to remove the work expeditiously triggered.  Another body of case law, however, holds that under appropriate circumstances, a service provider can be found to have a general red flag knowledge of infringing activity which disqualifies the service provider from obtaining DMCA safe harbor status altogether.

In Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), the defendants argued that,

> they could not be secondarily liable based on their knowledge that their products could be used to infringe copyrights.  Instead, the *Grokster* defendants suggested, they could be liable for contributory infringement only if they had actual knowledge of a *specific* infringement at a time when they were capable of preventing it.

Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1032 (9th Cir. 2013).  In rejecting this argument, the Supreme Court stated,

> where the evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements **or actions** directed to promoting infringement, *Sony*'s staple-article rule will not preclude liability. . . .   [O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

Grokster at 935-37. (Emphasis supplied).[6]

---

[6] *See also*, Capitol Records, Inc. v. MP3tunes, 2013 WL 1987225, *6 (S.D.N.Y. May 14, 2013) (District Court reversed prior grant of summary judgment in light of Second Circuit's

16

SRI submits that a reasonable juror could conclude that Ustream was "aware of facts or circumstances from which infringing activity is apparent" on its website and is thus not entitled to the DMCA safe harbor based on:

      (i)     the fact that it was well known in 2008 and 2009 that Ustream was considered one of the most blatant infringers of PPV events;

      (ii)    the fact that Ustream promoted its site as one that could reach an "infinite audience;"

      (iii)   the fact that Ustream took affirmative steps to take advantage of the illegal PPV streams by becoming an active PPV distributor;

      (iv)   the fact that Ustream did not adopt any reasonable measures to mitigate against massive illegal PPV streams by limiting the number of viewers of streams until the content could be verified, even after Ustream itself became a PPV distributor; and

      (v)    the fact that to protect Ustream's own PPV streams and to attract future PPV clients, Ustream monitors and takes down illegal streams it finds on its own website for content which it is licensing, but does not do the same for other copyright holders' content.

**D.**    **A Reasonable Juror Could Conclude That Ustream (i) did not Act Expeditiously Under the Circumstances and (ii) Did Not Remove or Disable Access to the "Material."**

    **i.**    **Failure to Act "Expeditiously."**

In its opening brief, Ustream argues that "[n]o court has ever held that [a two day delay in responding to a DMCA takedown notice] fails to qualify as 'expeditious.'" None of the cases cited by Ustream, however, dealt with a live PPV event and a live streaming website and a situation where pre-event advance notices of a live broadcast were provided to the website under

---

decision in Viacom stating "**[s]ince something less than a formal takedown notice may now establish red flag knowledge** . . . , the issue of Defendants' red flag knowledge cannot be resolved on summary judgment." (Emphasis supplied).

17 U.S.C. 411(c) and where the copyright holder requested the cooperation and assistance of the service provider which was ignored.

When Congress enacted the DMCA, it specifically intended that due to the fact that the Internet was developing and evolving, certain aspects of the statute would depend on the particular facts and circumstances.  In *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 (Bankr.C.D.Cal., 2010) *14-15[7], *aff'd.*, 653 F.3d 976 (9th Cir., 2011), the Court, in denying Google's motion for summary judgment for safe harbor status under the DMCA for failing to have met its burden with respect to certain DMCA notices, stated,

> the legislative history [of the DMCA] suggests that Congress contemplated that whether a service provider's removal or disabling of access to infringing material was expeditious ordinarily would be a factual rather than a legal inquiry, unless the delay is unusually lengthy and not justifiable. Thus, the Senate Judiciary Committee Report on the DMCA notes
>
>> Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual knowledge or awareness of facts or circumstances from which infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. ***Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.***

S. Rep. No. 105-190, at 44 (1998) (emphasis added).

*See also, Costar Group Inc. v. Loopnet, Inc.*, 164 F.Supp.2d 688, 704 (D. Md., 2001) ("There are several material factual disputes remaining as to whether the removal of allegedly infringing photographs was satisfactorily expeditious, . . . In order to resolve this issue, the factfinder will

---

[7] https://www.eff.org/files/filenode/Perfect10_v_Google/P10_v_Google_on_remand.pdf

18

have to focus on each photo and the policy in effect prior to the posting of each photo").

SRI submits that a reasonable juror could conclude that Ustream did not act expeditiously under the circumstances of this case.  Ustream, a live streaming site, was given pre-event advance notices of an upcoming live PPV event and provided with evidence of past illegal streams of a SRI PPV event that had taken place on Ustream.  Ustream refused to cooperate with SRI or provide SRI with the reasonable assistance SRI requested.  Given that Ustream had the ability to "remove or disable access to" SRI's broadcast while it was being illegally streamed, Ustream's decision to wait until the live stream was over and the damage done and then only disable the "channels" on which the material had been streamed was not "expeditious" under the circumstances.

<h3>ii.     Failure to Remove the "Material."</h3>

Ustream admits that the DMCA notices it received from SRI's agent on March 21, 2009 were valid DMCA notices, but that it is nonetheless entitled to the safe harbor because two days after the event, Ustream "disabled the three **channels** that **had** broadcast the March 21 Broadcast,"[8] and thus, Ustream alleges, it satisfied its obligation under 17 U.S.C. 512(c)(1)(C) to "respond[] expeditiously to remove, or disable access to, **the material**."

Because SRI's broadcast was streamed on Ustream and not uploaded to a server like YouTube which can be downloaded over and over, once SRI's broadcast was over, the "material" was not capable of being viewed on Ustream's website and thus Ustream lost the ability to "remove or disable access to" the material.  Ustream's disabling a user's channel that could be used to stream a myriad of content did not remove or disable access to SRI's material.

---

[8]    *Tran Dec. ¶ 7.*

*Hendrickson v. Ebay, Inc.*, 165 F.Supp.2d 1082, 1088 (C.D. Cal., 2001) ("the service provider must show that it expeditiously removed or disabled access to **the problematic material**"); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1177 (C.D. Cal., 2002) ("section 512(i) is focused on infringing users, whereas 512(c) is focused primarily on the **infringing material itself**").

Ustream has admitted that it did not remove or disable access to the material, i.e., SRI's broadcast, but only disabled the channels of the users who had streamed the material. Indeed, Ustream knows that disabling a channel after-the-fact that is no longer live streaming the infringing material is of little value to the copyright holder and that is why the takedown tool which Ustream itself developed, allows the copyright holder to disable the "audio visual content streamed in real-time by" users of the Ustream website. *Wirt Dec. ¶23.* In other words, by using Ustream's takedown tool, the copyright holder can actually disable or remove the infringing stream in real-time. Because Ustream, however, did not remove or disable access to the broadcast of the March 2009 Event, but only disabled the channels that "had" broadcast such material, Ustream did not comply with the plain language of the statute and thus is not entitled to the DMCA safe harbor.

For the foregoing reasons, SRI respectfully requests that the Court deny Ustream's Motion for Summary Judgment.

Respectfully submitted,

Date: April 10, 2014                    HUDSON, JONES, JAYWORK & FISHER

                                       By:   /s/ Michael G. Rushe
                                             Michael G. Rushe (#4959)
                                             225 South State Street
                                             Dover, DE 19901
                                             Tel.: (302) 734-7401
                                             mrushe@delawarelaw.com
                                       *Attorneys for Plaintiff Square Ring, Inc.*

21

## CERTIFICATE OF SERVICE

I, Michael G. Rushe, hereby certify that on April 10, 2014, the attached document was electronically filed with the Clerk of the Court under seal using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further hereby certify that on April 10, 2014, the attached document was also electronically mailed to the following person(s):

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Rodger R. Cole
Songmee L. Connolly
Elizabeth J. White
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
rcole@fenwick.com
sconnolly@fenwick.com
bwhite@fenwick.com

/s/ Michael G. Rushe
Michael G. Rushe (#4959)
HUDSON, JONES, JAYWORK & FISHER
225 South State Street
Dover, DE 19901
Tel.: (302) 734-7401
mrushe@delawarelaw.com

22