# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SQUARE RING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.  09-563-GMS |
| v. | ) | |
| | ) | |
| JOHN DOE-1, CHIEF EXECUTIVE OFFICER, | ) | |
| JOHN DOE-2, CHIEF TECHNICAL | ) | |
| OFFICER, JOHN DOE-3, PRESIDENT, JOHN | ) | |
| DOES 4-10, Individually and as officers, | ) | |
| directors, shareholders and/or principals of | ) | |
| USTREAM.TV, INC., a/k/a | ) | |
| USTREAM.TV.COM, a/k/a USTREAM, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| USTREAM.TV, INC., a/k/a, | ) | |
| USTREAM.TV.COM, a/k/a USTREAM, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT USTREAM'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT THAT IT IS ENTITLED TO "SAFE HARBOR" STATUS UNDER THE DMCA, 17 U.S.C. § 512

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Ustream.TV, Inc.,
a/k/a, Ustream.TV.com, a/k/a Ustream*

OF COUNSEL:

Rodger R. Cole
Songmee Connolly
Elizabeth J. White
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Tel:  (650) 988-8500

Dated:  April 25, 2014
1150521 / 35415

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................1

I.    THERE IS NO LEGAL PRECEDENT THAT DMCA SAFE HARBOR
      PROTECTIONS DO NOT APPLY TO LIVE BROADCASTS ......................................3

      A.    17 U.S.C. § 411(c) is a Registration Statute, not a "Live Broadcast
            Exemption," and it has Nothing to Do with the Facts of this Case ......................3

      B.    Square Ring's Speculations About Congress' Intent are Unsupported by
            the Legislative Record and Contradicted by Publicly Available Facts..................4

II.   THERE CAN BE NO GENUINE FACTUAL DISPUTE THAT USTREAM
      EXPEDITIOUSLY REMOVED OR DISABLED ACCESS TO THE
      MATERIAL ...............................................................................................5

III.  THERE CAN BE NO GENUINE FACTUAL DISPUTE THAT USTREAM DID
      NOT HAVE THE REQUISITE SPECIFIC KNOWLEDGE OF
      INFRINGEMENT ........................................................................................8

IV.   THE CONCLUSORY AND SELF-SERVING WIRT AND WESTRICH
      AFFIDAVITS ARE INSUFFICIENT TO WITHSTAND SUMMARY
      JUDGMENT ...............................................................................................9

V.    CONCLUSION .........................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bailey v. Viacom Inc.*,
　435 Fed. Appx. 85 (3d Cir. 2011) ........................................................................10

*Blair v. Scott Specialty Gases*,
　283 F.3d 595 (3d Cir. 2002) ...........................................................................9, 10

*Bristol-Myers Co. v. Erbamont, Inc.*,
　723 F. Supp. 1038 (D. Del. 1989) ..........................................................................4

*Capitol Records, LLC v. Vimeo, LLC*,
　No. 09 Civ. 10101, No. 09 Civ. 10105, 2013 U.S. Dist. LEXIS 133655
　(S.D.N.Y. Sept. 18, 2013).................................................................................6, 8

*MGM Studios Inc. v. Grokster, Ltd.*,
　545 U.S. 913 (2005) ............................................................................................9

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
　718 F.3d 1006 (9th Cir. 2013) ...........................................................................5, 8

*Viacom Int'l, Inc. v. YouTube, Inc.*,
　676 F.3d 19 (2nd Cir. 2012) ..............................................................................6, 8

STATUTES

17 U.S.C. § 512............................................................................................*passim*

17 U.S.C. § 411.......................................................................................1, 3, 4

ii

## INTRODUCTION

Square Ring bases its opposition ("Opp.") on the legally unsupportable position that an unrelated copyright registration provision, 35 U.S.C. § 411(c), abrogates the safe harbor status to which Ustream would otherwise be entitled under the Digital Millenium Copyright Act ("DMCA") at 35 U.S.C. § 512 *et seq.*  No court of law has ever reached such a conclusion. Lacking any case law to support its position that the DMCA safe harbor provisions do not apply to "live broadcasts," Square Ring argues that in enacting the DMCA safe harbor provisions in 1998, Congress could not possibly have foreseen the possibility of streaming live events over the Internet, because the technology did not yet exist.  This is simply not true.  As early as 1995, several years before Congress enacted the DMCA, baseball games and other sporting events were being broadcast over the Internet, and high-profile bands were webcasting live video and audio streams of their concerts.  Square Ring has no legal or factual basis for its attempt to bypass the DMCA's safe harbor provisions, and therefore this argument must be disregarded in favor of a proper analysis under the relevant safe harbor provisions of 17 U.S.C. § 512.

Turning to an analysis of the proper statutory factors, Square Ring concedes that Ustream has satisfied all of the threshold requirements for eligibility defined under the DMCA.  In fact, Square Ring concedes Ustream's safe harbor entitlement on all but two of the factors discussed in Ustream's opening motion. Square Ring concedes:

- Ustream is a "service provider," as defined in the DMCA;
- Ustream has adopted and reasonably implemented a policy for the termination in appropriate circumstances of repeat infringers;
- Ustream does not interfere with standard technical means by which copyright holders may identify protected copyrighted works; and
- Ustream satisfies 512(c)(1)(B) because it does not have the requisite "right and ability to control" online content generated by its users.

In its Opposition, Square Ring contends there is a factual dispute as to whether Ustream acted "expeditiously" to remove content, but Ustream's DMCA tracking logs demonstrate it has

always been Ustream's policy to take down identified content within several business days, and often on the same day, of receiving a DMCA-compliant notice. This case was no different; once Square Ring finally provided sufficient information to identify the content, Ustream responded on the following business day by disabling the three broadcast channels believed to have streamed the identified content. Numerous federal courts have held that similar response times are indisputably "expeditious" for purposes of granting summary judgment, and Square Ring has not pointed to any contrary authority. Applying the undisputed facts of this case to the applicable law from other courts considering this statutory factor, there can be no genuine dispute that Ustream satisfied its safe harbor obligation to act expeditiously to remove content.

Square Ring also contends that Ustream had the requisite actual or constructive knowledge of infringement to preclude safe harbor protections. Square Ring concedes that there is well-settled law establishing that only knowledge of infringement of the *sued-upon work*—and not broader infringement of other works—may be considered by the Court. Square Ring alludes to "another body of case law" that would allow a Court to consider evidence of broader infringement, but does not cite this "body of case law" and the only case it cites has nothing to do with the DMCA safe harbor provisions. Because Square Ring has provided no evidence that Ustream had actual or constructive knowledge of the sued-upon infringement until it received the DMCA-compliant notices on March 21, 2009—when it acted expeditiously to disable the allegedly infringing channels—there is no genuine dispute of fact on this factor.

Lastly, Square Ring spends a significant portion of its opposition disparaging Ustream's reputation, relying on self-serving and conclusory affidavits of a Square Ring employee and Square Ring's counsel of record.[1] These assertions (many of which are inadmissible hearsay)

---

[1] Ustream objects to ¶¶ 13-15 and 17-23 of the Declaration of John Wirt in Support of Square Ring's Opposition Brief, ("Wirt Decl."), and ¶¶ 3-6 of the Declaration of Donna Westrich in

cannot create a genuine dispute of fact sufficient to preclude summary judgment.  Furthermore,

as described in more detail below, several of these statements are also demonstrably false and

cannot create a genuine disputed material fact.  Because none of Square Ring's arguments create

a genuine factual dispute as to Ustream's entitlement to safe harbor status, Ustream respectfully

requests that the Court grant its motion for summary judgment.

## I.   THERE IS NO LEGAL PRECEDENT THAT DMCA SAFE HARBOR PROTECTIONS DO NOT APPLY TO LIVE BROADCASTS

### A.   17 U.S.C. § 411(c) is a Registration Statute, not a "Live Broadcast Exemption," and it has Nothing to Do with the Facts of this Case

Square Ring misleadingly refers to 17 U.S.C. § 411(c) throughout its brief as the "live

broadcast exemption," but this is a misnomer that Square Ring has concocted to suit the purposes

of its argument.  Opp. at 10-11.  There is no such exception.  In fact, this statute—formerly 17

U.S.C. § 411(b)—has nothing to do with the secondary liability of ISPs or any of the facts at

issue in this case.  Section 411(c) was included in the Copyright Act in 1976, twelve years before

the DMCA was added to the Copyright Act.  It is a copyright registration statute which provides

owners of a "work consisting of sounds, images, or both, the first fixation of which is made

simultaneously with its transmission" permission to register their work within a certain time after

its transmission, thereby preserving a right of action for infringement.  17 U.S.C. § 411(c).  The

issue of whether Square Ring properly registered its copyright has no relevance to the instant

summary judgment motion, which is solely focused on Ustream's entitlement to DMCA safe

harbor status under 17 U.S.C. § 512.

Furthermore, there is not a single case from any court in the country holding that 17

U.S.C. § 411(c) abrogates the safe harbor protections afforded to ISPs under the DMCA if the

Support of Square Ring's Opposition, ("Westrich Decl."), as lacking foundation and because the
statements contained therein are inadmissible hearsay.  Mr. Wirt is lead counsel for Square Ring
and has appeared before this Court at every hearing since dismissal of Square Ring's previous
firm.

alleged copyright work at issue is a "live broadcast."   Square Ring's description of this statute as a "live broadcast exemption" to the DMCA safe harbor provisions is wholly without merit.

### B.   Square Ring's Speculations About Congress' Intent are Unsupported by the Legislative Record and Contradicted by Publicly Available Facts

Lacking any case law for its position that the DMCA safe harbor protections should not extend to a live sports broadcast, Square Ring resorts to the argument that Congress "never intended" for live streaming sites such as Ustream to be covered by the safe harbor protections. This position is in conflict with a plain reading of the DMCA statutes, which Square Ring acknowledges do not contain any exemption or distinction for "live broadcasts."  Nor has Square Ring cited to a single portion of the legislative record in support of its position.  *Bristol-Myers Co. v. Erbamont, Inc.*, 723 F. Supp. 1038, 1040-1041 (D. Del. 1989) (declining to adopt plaintiff's interpretation of a statute that was "in conflict with the plain meaning of the statute and unsupported by any clearly expressed legislative history to the contrary.")

To get around the fact that the DMCA itself contains no statutory exemption for live broadcasts, Square Ring contends that  Congress would not have contemplated adding one in 1998, because "Congress enacted the DMCA at a time when the streaming of live sporting events was not even a practical possibility." Opp. at 12.  Square Ring cites no evidence for this statement, and in fact it is easily disproven by a simple factual investigation into the history of streaming technology.  For example, in 1995, several years before Congress enacted the DMCA, a baseball game between the New York Yankees and the Seattle Mariners was broadcast over the Internet.  *See*, *e.g.,* Cole Reply Decl., Ex. A.   In the music industry, live Internet broadcasts were happening as early as 1994; for example, the Rolling Stones' 20-minute broadcast of live audio and video from a concert in Dallas received attention from national media. *See*, *e.g.*, *id.*, Ex. B.

4

Considering Congress's express intention that the DMCA "facilitate making available quickly and conveniently via the Internet . . . movies, music, software, and literary works," and given that live broadcasts over the Internet were well established by the time that the DMCA was enacted in 1998, the omission of a live broadcast exemption from the DMCA safe harbor legislation cannot be a mere oversight, as Square Ring argues.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021 (9th Cir. 2013) (citing S. Rep. No. 105-190 in its decision rejecting plaintiff's narrow construction of safe harbor provisions, and granting summary judgment for defendant ISP).

Not only does Square Ring fail to cite to a single case in support of its argument that live broadcasts are exempted from DMCA safe harbor protections, but its two arguments—a misleading characterization of an unrelated statute and a conjecture about Congress's intent that relies on gross factual inaccuracies about the state of live broadcast technology in 1998—do not create a genuine issue of fact about Ustream's entitlement to safe harbor protection.

## II.    THERE CAN BE NO GENUINE FACTUAL DISPUTE THAT USTREAM EXPEDITIOUSLY REMOVED OR DISABLED ACCESS TO THE MATERIAL

In an attempt to manufacture a "factual dispute" to overcome summary judgment on this issue, Square Ring incorrectly states throughout its opposition and supporting papers that Ustream "ignored" or "did not respond" to the initial correspondence sent by Square Ring in the days leading up to the March 21 broadcast.  Opp. at 3-4, Wirt Decl. at ¶ 8.  These statements are false.  As the former supervisor of Ustream's content monitoring team explained in her opening affidavit, the content monitoring team responded to Square Ring's March 17 letter in writing, the very same day, asking Square Ring to identify either a URL or a channel ID, because without such information, there was no way for them to "weed out the allegedly infringing broadcasts from the thousands of live and recorded broadcasts streamed on Ustream's platform each day." .

Declaration of Suzanne Tran in Support of Ustream's Motion for Summary Judgment, ("Tran Decl.) at ¶ 6, Ex. E.  But this was not all; based on the limited information provided in Square Ring's March 17 letter, Ustream's content monitoring also ran a keyword search the same day in an attempt to identify potentially infringing material.  (*Id*. at ¶ 6)

Square Ring also repeatedly faults Ustream throughout its opposition for not providing it with a "takedown tool" in advance of the March 21 event, suggesting that Ustream's failure to do so demonstrates indifference to the alleged infringement.  Opp. at 4.  This argument again ignores the factual record, which clearly states that *Ustream did not develop the take-down tool technology until August of 2009*, months after the broadcast at issue in this litigation.   Tran Decl. at ¶ 9; Declaration of Sheryl Zapanta in Support of Ustream's Motion for Summary Judgment ("Zapanta Decl.") at ¶ 7.  Nor has Square Ring cited to any case holding that an ISP is precluded from safe harbor status for its failure to provide a take-down tool or other monitoring technology—let alone an ISP who, like Ustream, had not even developed such technology.  In fact, district courts have taken the opposite position, concluding that conditioning an ISP's safe harbor protection on its use of particular monitoring technology would violate § 512(m), which makes clear that service providers are under no affirmative duty to seek out infringement. *See, e.g., Capitol Records, LLC v. Vimeo, LLC*, No. 09 Civ. 10101, No. 09 Civ. 10105, 2013 U.S. Dist. LEXIS 133655, at *64-65 (S.D.N.Y. Sept. 18, 2013) (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2nd Cir. 2012) and explaining that "§ 512(m) and attendant case law make clear that service providers are under no affirmative duty to seek out infringement … [t]his remains the case even when a service provider has developed technology permitting it to do so.")

Furthermore, even if Ustream *had* ignored Square Ring (which it did not), this would be legally insignificant, because its duty to "expeditiously" remove the content was not triggered

until it received a DMCA-compliant notice from Square Ring on Saturday, March 21.  *See* discussion at Ustream's Summary Judgment ("Ustream MSJ") at 15-16.  On the following business day, Ustream disabled the three broadcast channels that had allegedly streamed the identified content, which was consistent with its policy of taking down identified content within several business days, and often on the same day, of receiving a DMCA-compliant notice.  Tran Decl. at ¶ 7; Zapanta Decl. at ¶¶ 5-6;  Wirt Decl., Ex G .

Whereas Ustream has cited to several cases granting summary judgment on safe harbor status in favor of ISP defendants in which similar response times have been deemed "expeditious," Square Ring has not cited to a single case suggesting that a response time of one business day could create a genuine factual dispute.  Square Ring's attempt to create a factual dispute by mischaracterizing Ustream's efforts to cooperate with Square Ring in the days leading up to the broadcast cannot withstand an analysis of the factual record.

Lastly, Square Ring argues that Ustream could not have satisfied its obligations under 17 U.S.C. § 512(c)(1)(C), because in disabling the three allegedly infringing streaming channels after the boxing match had allegedly already been streamed, it did not comply with the statute's requirement that it remove or disable access to the "material."  Square Ring has not cited to, nor is Ustream aware of, any case suggesting such an interpretation.  Furthermore, Square Ring's argument that Ustream's complete disabling of the three user channels responsible for the alleged infringement falls short of satisfying 512(c)(1)(C) ignores the full language of this statutory provision, which requires that the service provider, "upon obtaining such knowledge or awareness, acts expeditiously to remove, *or disable access to*, the material."  Under the standard Square Ring is essentially proposing, Ustream would be required to simultaneously remove a sporting event as it is occurring live, or else be precluded entirely from the protections of the safe

harbor provisions—but this is not the law.  As numerous cases have held, including cases involving copyrighted video content streamed over the Internet, summary judgment of safe harbor status is justified where the facts demonstrate that the service provider responded within one day of the DMCA takedown notice, and therefore acted *expeditiously*, as the statute requires. *See, e.g., Capitol Records*, 2013 U.S. Dist. LEXIS 133655, at *27.

## III.   THERE CAN BE NO GENUINE FACTUAL DISPUTE THAT Ustream DID NOT HAVE the requisite SPECIFIC knowledge of infringement

As explained in Ustream's opening brief, in determining whether a service provider qualifies for safe harbor status under 512(c)(1)(A)(i)-(iii), the Court may only consider notices relating to the **specific works in dispute**, and not evidence of broader infringement on the service provider's website.  Ustream MSJ at 13.  Decisions issued since *Viacom v. YouTube* confirm this principle, making clear that whether a plaintiff is alleging actual <u>or</u> constructive ("red flag") knowledge under 512(c)(1)(A), the only evidence a Court may consider is evidence relating to the **sued-upon content**.  *See, e.g.,UMG Recordings, Inc.*, 718 F.3d at 1023  ("general knowledge that it hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag … the DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection."); *see also Capitol Records*, 2013 U.S. Dist. LEXIS 133655, at *62 ("To hold otherwise—i.e., that instances of willful blindness as to infringing content collateral to the litigation are sufficient to divest a defendant of safe harbor protection—would swallow Viacom's requirement that ***actual or red flag knowledge be specific to the sued-upon content***") (emphasis added).

Square Ring concedes that the numerous cases cited in Ustream's summary judgment motion support this principle, but it argues that "another body of case law" holds that "under

appropriate circumstances, a service provider can be found to have a general red flag knowledge of infringing activity which disqualifies the service provider from obtaining DMCA safe harbor status altogether." Opp. at 16. The only case Square Ring cites from this purported "other body of case law," however, does not even mention the DMCA safe harbor provisions *whatsoever*; rather, the case involves an analysis of secondary copyright liability under a different standard, and does not contradict the holdings of multiple appellate courts that "knowledge" under 512(c)(1)(A)(i)-(iii) requires knowledge of the specific works at issue rather than broader infringement. *See generally MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).[2]

Square Ring puts forth a variety of evidence—all or most of it unsubstantiated in the factual record—that allegedly demonstrates Ustream's actual or constructive knowledge of its users' infringement of other sports broadcasts prior to the boxing match that is the subject of this litigation. Opp. at 2-5. But as the above-cited cases make clear, these allegations of prior infringement are not to be considered in the Court's analysis of whether and when Ustream had actual or constructive knowledge of the sued-upon boxing match. Therefore, the earliest possible date on which actual and/or constructive knowledge can be imputed to Ustream is March 21, 2009—the day that Square Ring provided sufficient information for Ustream to identify the source of the alleged video streams. *See* discussion in Ustream MSJ at 5-6.

## IV. THE CONCLUSORY AND SELF-SERVING WIRT AND WESTRICH AFFIDAVITS ARE INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT

Finally, Square Ring's attempt to create a factual dispute with the conclusory and self-serving affidavits of John Wirt and Donna Westrich must be rejected under Delaware law. *See,*

---

[2] In *Grokster*, the Court addressed whether defendants, providers of peer-to-peer file sharing software, had knowingly and intentionally distributed their software to enable users to reproduce and distribute copyrighted works in violation of the Copyright Act, 17 U. S. C. §101 *et seq.* There is no mention of the DMCA in the decision, let alone of an analysis under the statuory factors.

*e.g.*, *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) ("conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.")  An affidavit that is "essentially conclusory" and lacking in specific facts is inadequate to satisfy the burden of a party opposing summary judgment. *Id.; see also Bailey v. Viacom Inc.,* 435 Fed. Appx. 85, 92 (3d Cir. 2011).  As in these cases, Square Ring has offered two self-serving affidavits that are filled with opinions and conclusory statements rather than specific facts. *See, e.g.*, Westrich Decl. at ¶ 3 ( it was "common knowledge in the boxing and MMA industries in 2008 and 2009 that if someone wanted to see a boxing or MMA PPV event for free, that person could most likely find the event being streamed on Ustream.")  Mr. Wirt, lead counsel for Square Ring, lodges similar conclusory statements. *See, e.g.*, Wirt Decl. at ¶ 6 ("Given the illegal piracy that SRI was aware of taking place on Ustream, SRI believed that it was a virtual certainty that the March 2009 Event would be illegally streamed.")[3]  Furthermore, these allegations are irrelevant to the instant summary judgment motion because *they do not relate to the sued-upon infringement* (see discussion at Section III, *supra*).  Mr. Wirt's and Ms. Westrich's conclusory statements do not create a factual dispute sufficient to overcome summary judgment on safe harbor status.

## V.    CONCLUSION

Based upon the foregoing and the positions set forth in its Opening Brief, Defendant Ustream respectfully requests that the Court grant its motion for summary judgment that it is entitled to "safe harbor" status under the Digital Millennium Copyright Act, 17 U.S.C. § 512.

---

[3] The fact that Square Ring is only now raising such allegations in an attempt to overcome summary judgment, after not providing them in its discovery responses, underscores the self-serving motives of the declarants. *See* Cole Reply Decl. at ¶ 3, Ex. C (attaching Square Ring's interrogatory responses).

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  _/s/ Richard L. Horwitz_____
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
Rodger R. Cole
      Bindu A. Palapura (#5370)
Songmee Connolly
      Hercules Plaza 6th Floor
Elizabeth J. White
      1313 N. Market Street
FENWICK & WEST LLP
      Wilmington, DE  19899
Silicon Valley Center
      Tel:  (302) 984-6000
801 California Street
      rhorwitz@potteranderson.com
Mountain View, CA  94041
      dmoore@potteranderson.com
Tel:  (650) 988-8500
      bpalapura@potteranderson.com

Dated:  April 25, 2014
      *Attorneys for Defendant Ustream.TV, Inc.,*
1150521 / 35415
      *a/k/a, Ustream.TV.com, a/k/a Ustream*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on April 25, 2014, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on April 25, 2014, the attached document was electronically mailed to the following person(s)

Michael G. Rushe
Hudson, Jones, Jaywork & Fisher, LLC
225 South State Street
Dover, DE 19901
mrushe@delawarelaw.com

Pamela Cocalas Wirt
John S. Wirt
Wirt & Wirt, P.C.
770 Bryant Avenue
Winnetka, IL 60093
pcwirt@wirtlawfirm.com
jwirt@wirtlawfirm.com

/s/ Richard L. Horwitz
Richard L. Horwitz
David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

957067 / 35415