IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SQUARE RING, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN DOE-1, CHIEF EXECUTIVE OFFICER, <br> JOHN DOE-2, CHIEF TECHNICAL OFFICER, <br> JOHN DOE-3, PRESIDENT, JOHN DOES 4-10, <br> Individually and as officers, directors, <br> shareholders and/or principals of USTREAM.TV, <br> Inc., a/k/a USTREAM.TV.COM, a/k/a USTREAM, <br><br> and <br><br> USTREAM.TV, INC., a/k/a, <br> USTREAM.TV.COM, a/k/a USTREAM <br><br> Defendants. | Civil Action No. 09-563 (GMS) |

## **MEMORANDUM**

### I. INTRODUCTION

On July 30, 2009, Square Ring, Inc. ("Square Ring") filed suit against John Does 1-10, UStream.TV Inc., and UStream.TV.COM ("UStream") seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*, and common law Trademark infringement (D.I. 1 at ¶ 6.) In its complaint, Square Ring alleged that on March 21, 2009, UStream disseminated a copyrighted boxing and mixed martial arts broadcast owned by Square Ring. (*Id.* ¶¶ 3-5.) Square Ring further alleged, among other things, that UStream did not immediately remove or disable access to the broadcast after Square Ring made a demand. (*Id.* ¶ 5.) On July 13, 2013, UStream filed a motion for summary judgment in which it argued that, under the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512,

it is immune from monetary liability for copyright infringement. (D.I. 100.)

Presently before this court is UStream's Motion for Summary Judgment. (D.I. 100.)

## II. BACKGROUND

Square Ring is a Florida-based and Delaware-incorporated boxing promotional company that is majority owned by boxer Roy Jones, Jr. (D.I. 1 at ¶ 1.) Square Ring acquires rights to boxing matches from fighters to promote boxing events. (*Id.*) Such promotion includes selling tickets to the public and licensing rights to television networks to distribute the event, on a pay-per-view basis, to residential purchasers and/or on a closed circuit basis to bars and restaurants for commercial exhibition in public venues. (*Id.*) Square Ring is the copyright owner of the complete March 21, 2009, boxing and mixed martial arts ("MMA") broadcast featuring Roy Jones, Jr., vs. Omar Sheika, including all of its undercard events and all other portions of the broadcast (the "March 21 Broadcast"). (*Id.* ¶ 3.)

UStream is a Delaware corporation that describes itself as "a user-generated content website, allowing millions throughout the world to freely view and share a wide variety of content ranging from news, politics, music, entertainment, education, and personal events through its site and services." (D.I. 101 at 2.) Each month, UStream's users broadcast approximately 1,488,554 live streams and 429,157 recorded broadcasts. (Declaration of Sheryl Zapanta ("Zapanta Decl.") at ¶ 2.) Before any of UStream's users are permitted to broadcast or share content on Ustream's website, they must register with UStream by providing an email address, user name, and password.

2

Users must also read and agree to UStream's Terms of Service before they are allowed to register.¹ (*Id.*) (Declaration of Suzanna Tran ("Tran Decl.") at ¶ 2; Zapanta Decl. at ¶ 3.)

During the relevant period, UStream also maintained a Copyright and IP Policy ("Copyright Policy"), publicly available and accessible on UStream's website. (Tran Decl. at ¶ 3; Zapanta Decl. at ¶ 4.) The Copyright Policy provides information and a means by which copyright owners can report alleged infringement to UStream's designated copyright agent pursuant to the Digital Millennium Copyright Act ("DMCA"), including by emailing the requisite DMCA notice information to UStream. (*Id.*) Copyright owners are instructed to submit a list of the copyrighted works and to identify the URL where the allegedly infringing content can be found. (*Id.*)

Since 2008, a team of UStream employees (hereinafter, "Content Monitoring Team") located in the San Francisco Bay Area and in Budapest, Hungary has actively monitored and responded to incoming copyright infringement notices. (Tran Decl. at ¶ 4.) First, the Team reviews each incoming notice to make sure that it includes the requisite DMCA information listed in UStream's Copyright Policy. (Tran Decl. at ¶ 4; Zapanta Decl. at ¶ 5.) If the notice does not contain the requisite DMCA information, then an employee will promptly respond to the complainant by email, asking the notice be supplemented with the missing information.² (*Id.*)

---

¹ The Terms of Service expressly prohibited UStream subscribers from using the website to "TRANSMIT, ROUTE, PROVIDE CONNECTIONS TO OR STORE ANY MATERIAL THAT INFRINGES COPYRIGHTED WORKS OR OTHERWISE VIOLATES OR PROMOTES THE VIOLATION OF THE INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY" and further states that "UStream has adopted and implemented a policy that provides for the termination in appropriate circumstances of the accounts of users or Members who repeatedly infringe or are believed to be infringing the rights of copyright holders." Tran Decl. at ¶ 2; Zapanta Decl. at ¶ 3. Before a registered user can upload and stream content, they are reminded of UStream's zero tolerance policy, of their agreement to the Terms of Service, and that a violation may lead to suspension or a permanent ban from using the site. Zapanta Decl. at ¶ 3. These policies were in place at the time of the March 21 Broadcast. Tran Decl. at ¶ 2.

² UStream also tracks and logs all of its incoming DMCA complaints. UStream archives and logs each DMCA complaint it receives in a database that records the following information for each incident of infringement: the URL and name of the infringing UStream channel; the user ID associated with the infringing broadcast; the date

3

In anticipation of the potential for internet piracy of the March 21 Broadcast, counsel for Square Ring sent a Notice of Infringement to the authorized Copyright Agent for UStream on March 17, 2009. (D.I. 102-1 at 19.) This first notice included a written demand that any and all access to the March 21 Broadcast on UStream be blocked prior to its exhibition or, in the alternative, that Square Ring be provided with a removal tool or that appropriate staffing be made available by UStream so that, "immediately upon notification" by Square Ring, UStream would be able to delete the unauthorized distribution of the March 21 Broadcast. (*Id.* at 14–15.) A member of UStream's Content Monitoring Team responded to Square Ring the same day requesting that it "provide the specific channel information and/or include the channel URL, in order for the copyright team to accurately identify the location of the stream." (*Id.* at 19.)

In an email to UStream dated March 18, 2009, counsel for Square Ring reiterated his request and further demanded that "my client be given a tool to simultaneously manage infringing content on your site or immediate access to a contact at your company who will be made available on March 21st to ensure that all offending materials are promptly removed." (D.I. 102-1 at 18.) In a subsequent email, counsel for Square Ring also reiterated that, "[y]our failure to act will lead to my client taking all legal measure to protect their interests and we are once again notifying you that your actions or, in this case inactions will lead to a waiver of any safe harbor protection that may have been afforded to you . . . ." (D.I. 128-6 at 2.) As a result of Square Ring's emails, UStream employees ran targeted keyword searches across the website and responded by stating that they had "expeditiously removed or disabled material" identified in response to Square Ring's

---

and time that UStream removed the infringing content; the length of the broadcast; the viewer count; and the reason for the ban. Zapanta Decl. at ¶ 6.

communications. (D.I. 102-1 at 18.) Counsel for Square Ring sent an email with "FOURTH INFRINGEMENT NOTICE" as the subject line on March 20, which again lacked specific URL or channel identification. (D.I. 128-6 at 2.) The email stated that UStream has "not provided any response to [Square Ring's] request that [UStream] either provide us with a 'take down tool' or appropriate staffing with the ability to simultaneously remove infringing content from your site." (*Id.*)

On Saturday, March 21, 2009, Square Ring's third party monitoring agent delivered notices to UStream's designated copyright agent identifying three URLs streaming broadcasts of the March 21 Broadcast. (Tran Decl. at ¶ 7.) UStream concedes that these notices were DMCA-compliant and sent at 6:26 p.m., 7:13 p.m., and 9:33 p.m. (PST). (*Id.*) On Monday, March 23, 2009, UStream disabled the three channels that had broadcast the March 21 Broadcast. (*Id.*) UStream responded to Square Ring's designated agent at 7:53 p.m. and 7:55 p.m. (PST) on the evening of March 23, informing them that the content on the three infringing channels, to the extent it was still available on UStream's website, had been removed. (*Id.*)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177,

181 (3d Cir. 2011). There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material fact exists, the district court must view the evidence in a light most favorable to the nonmoving party and draw inferences in that party's favor. *See Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing FED. R. CIV. P. 56(e)).

Importantly, the mere existence of some evidence in support of the nonmoving party will not prove sufficient for denial of a summary judgment motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* Specifically, the party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Thus, a nonmoving party asserting that a material fact is in dispute must support this assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." *See* FED. R. CIV. P. 56(c)(1). If the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## IV. DISCUSSION

Square Ring's complaint contains eight counts: (I) Direct Copyright Infringement; (II) Contributory Copyright Infringement; (III) Vicarious Copyright Infringement; (IV) Inducement of Copyright Infringement; (V) Common Law Trademark Infringement; (VI) Common Law Contributory Trademark Infringement; (VII) Common Law Vicarious Trademark Infringement; and (VIII) Common Law Inducement of Trademark Infringement. (*See* D.I. 1.) Square Ring's claims arise from the online streaming on UStream of the March 21 Broadcast.

UStream asserts that it should be awarded summary judgment as to Square Ring's copyright claims because there is no genuine issue of material fact that UStream meets the threshold eligibility and specific requirements for Safe Harbor protection under the DMCA. (*See* D.I. 101 at 8–12.) In opposition, Square Ring asserts that a reasonable juror could conclude that UStream did not, under the circumstances, act expeditiously to remove the March 21 Broadcast as required by the DMCA but was instead "willfully blind" to the "red flag knowledge" provided by Square Ring's infringement notices. (D.I. 127 at 17–20.)

### 1. The DMCA

The court is unaware of any relevant Third Circuit precedent addressing the application of the DMCA and its safe harbor provisions. As such, the court relies primarily on case precedent from the Second Circuit. The court has been aided by its review of the statutory scheme and exceptions provided under the DMCA in the resolution of UStream's motion.

Congress enacted the DMCA in 1998 in an effort to resolve the unique copyright enforcement problems posed by the widespread use of the internet. *See, e.g., UMG Recordings, Inc. v. Veoh Networks, Inc.*, Nos. 09-55902, 09-56777, 10-55732, 2013 U.S. App. LEXIS 5100 at

7

*13–14 (9th Cir. Cal. Mar. 14, 2013). This effort involved a balancing of the interest of copyright holders, on the one hand, against the interests of two distinct parties: legitimate end-users, who have an interest in not having their material taken down without recourse, and internet service providers ("ISPs"), whose services might be used to commit copyright infringement. *See e.g.*, *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004).

The DMCA establishes several "safe harbors" that protect eligible service providers from all monetary and most equitable liability that may arise from acts of copyright infringement committed on their website by end-users. Specifically, the DMCA safe harbors provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools. *See* 17 U.S.C. §§ 512(a)–(d); *see also Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 41 (2d Cir. 2012).

## 2. Counts I-V: Copyright Claims[3]

Square Ring asserts that the DMCA safe harbor provisions do not apply to "live broadcasts" because Congress could not have foreseen the possibility of streaming live events on the internet in 1998 when the legislation was passed.

Square Ring asserts that the DMCA safe harbor protections should not extend to a live sports broadcast because Congress never intended for live streaming sites such as UStream to be covered by the safe harbor protections. It is undisputed that the DMCA itself contains no statutory

---

[3] UStream's motion for summary judgment does not address Square Ring's trademark claims (Counts VI-VIII). Square Ring asserts that UStream has thus waived its right to move for summary judgment with respect to those claims. Because the court determines that denial of UStream's motion for summary judgment is appropriate, all Counts will proceed to trial.

8

exemption for live broadcasts. Rather, Square Ring contends that Congress would not have contemplated adding such an exemption in 1998, because "Congress enacted the DMCA at a time when the streaming of live sporting events was not even a practical possibility, . . ." (D.I. 127 at 12.) Square Ring cites no evidence for this assertion while UStream provides a number of examples of live internet broadcasts occurring in the years prior to 1998. (D.I. 132 at 4; Ex. A; Ex. B.) The court is not persuadeded that Congress intended to exclude live broadcasts from safe harbor protection and will proceed through the statutory analysis.

### a. *DMCA Threshold Requirements*

To be eligible for any of the DMCA safe harbors listed in 17 U.S.C. §§ 512(a)–(d) a service provider must meet the following threshold conditions for eligibility: (1) qualify as a "service provider" as defined under 17 U.S.C. § 512(k)(1)(B); (2) demonstrate that it has adopted and reasonably implemented a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers; and (3) prove that it accommodates and does not interfere with standard technical means by which copyright holders may identify protected copyright works. *See Viacom Int'l*, 676 F.3d at 27.

For purposes of the § 512(c) safe harbor, a service provider is defined as "a provider of online services or network access, or the operator of facilities therefor." *See Viacom Int'l.*, 676 F.3d at 27 (citing 17 U.S.C. § 512(k)(1)(B)). This definition encompasses a wide variety of internet activities. *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2011) (finding that defendant service provider, whose website allowed online sharing of photos and videos at the direction of its users, qualified as a "service provider" under § 512(k)(1)(B)); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143 (N.C. Cal. 2008) (defendant that

9

provided software and a website that enabled sharing of user-provided video content over the internet qualified as a "service provider" under § 512(k)(1)(B)); *see also Corbis*, 351 F. Supp. 2d at 111 (noting the "broad scope" of the definition of "service provider" under § 512(k)(1)(B)).

Similar to the ISPs cited in the cases above, UStream provides a website that allows its users to stream, share, and comment on user-generated video content. The court concludes that no genuine issue of material fact exists as to UStream's qualification as a "service provider" under § 512(k)(1)(B).

Pursuant to 17 U.S.C. § 512(i), to qualify for a safe harbor, a service provider must demonstrate that it has "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." *See Viacom Int'l*, 676 F.3d at 40 (quoting 17 U.S.C. § 512(i)(1)(A)). A service provider satisfies the "reasonable implementation" requirement if it has a policy under which copyright holders can submit a take-down notice, such policy is available to the public through its website, and the service provider acts to remove infringing content once it receives adequate takedown notices. *See Wolk*, 840 F. Supp. 2d at 744; *see also Io Grp.*, 586 F. Supp. 2d at 1143 (internal citations omitted). The record demonstrates that UStream has a strong DMCA policy, provides instructions for copyright owners to report alleged copyright infringement, takes active steps to limit incidents of infringement on its website and works diligently to keep unauthorized works off its website.[4]

To satisfy the third and final threshold eligibility requirement for safe harbor status, a service provider must accommodate and not interfere with standard technical measures used by

---

[4] *See supra* notes 1–2.

10

copyright owners to identify or protect copyrighted works. 17 U.S.C. §§ 512(i)(1)(B)–(512(i)(2). Appropriate standard technical measures must be developed "pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary . . . process," be "available to any person on reasonable and nondiscriminatory terms," and not "impose substantial costs" on service providers. 17 U.S.C. § 512(i)(2)(A–C). Square Ring has not presented any evidence that UStream sought to conceal, delete, or suppress its ability to identify the March 21 Broadcast. Quite the opposite is true here. Square Ring's monitoring agent was able to readily identify the channel names and URLs of the three purportedly infringing streams on the day that they were broadcast. *See* Tran Decl. at ¶ 7. Further, the Complaint alleges that the Square Ring "logo is clearly displayed in the screen in which the Copyrighted Broadcast is exhibited." D.I. 1 at ¶ 32. Consequently, the court concludes that there is not dispute that UStream satisfies this final condition for eligibility.

The court finds, as a matter of law, that UStream meets all three of the DMCA threshold requirements.

### b. *DMCA Specific Requirements*

Once the threshold eligibility requirements have been met, a service provider must then satisfy the specific requirements for the applicable safe harbor provision. Here, UStream asserts that it is entitled to safe harbor protection under 17 U.S.C. § 512(c). (D.I. 101 at 12.) That provision protects service providers from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," if the service provider:

11

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(A–C).

The DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection. *UMG Recordings, Inc.*, at 1023. Congress made clear that the DMCA does not mandate service providers affirmatively monitor their websites directing that, "[n]othing in this section shall be construed to condition the applicability of subsections (a) through (d) on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

Under 512(c)(1)(A)(i)–(ii), to determine whether a defendant had actual knowledge or sufficient awareness of facts and circumstances from which infringing activity was apparent, the court may only consider notices relating to the specific copyrighted work or works in dispute. *See Corbis*, 351 F. Supp. 2d at 1107–08. Notices must also substantially comply with the DMCA notice requirements listed in 512(c)(3)(A). *See Wolk*, 840 F. Supp. 2d at 746–47 (notices not identifying specific location of alleged infringement insufficient to confer "actual knowledge" on service provider).

Where a service provider is "aware of a high probability of the fact [of infringement] and consciously avoid[s] confirming that fact," that provider is willfully blind to infringement and may lose the protections of the safe harbor. *Viacom*, 676 F.3d at 35. The court understands that UStream was not under an affirmative duty to discover and remove the March 21 Broadcast; however, the court concludes that questions of material fact exist as to whether UStream was willfully blind such that it is not eligible for safe harbor protection. Similarly, the court finds that questions related to UStream's "red flag knowledge" as a result of the pre-event notices are appropriately left to trial. *See Capitol Records, Inc. v. MP3tunes, LLC*, 2013 WL 1987225, at *4 (S.D.N.Y. May 14, 2013) (concluding that something less than a formal takedown notice may establish red flag knowledge). As such, the court determines that the lack of DMCA-compliant notice prior to the March 21 Broadcast is not fatal to Square Ring's claims.

UStream asserts that each of the four notices predating March 21 were deficient under DMCA and, as a result, knowledge of the infringing broadcasts may not be imputed to UStream prior to March 21, 2009. Square Ring, while conceding the lack of DMCA notice prior to March 21, 2009,[5] contends that UStream had the requisite actual or constructive knowledge of infringement to preclude safe harbor protections.

Square Ring contends there is a factual dispute as to whether UStream acted "expeditiously" to remove the March 21 Broadcast. Square Ring argues that none of the cases

---

[5] Here, it is clear to the court that Square Ring was incapable of providing a formal takedown notice compliant with the DMCA prior to the start of the March 21 Broadcast. 17 U.S.C. § 512 (c)(3)(A)(i–vi) provides the elements of a DMCA-compliant notification. Relevant for purposes of this decision, subsection (ii) requires that a written communication be provided to a service provider that includes "[i]dentification of the copyrighted work claimed to have been infringed" and subsection (iii) which requires "[i]dentification of the material that is claimed to be infringing . . . and information reasonably sufficient to permit the service provider to locate the material."

cited by UStream dealt with a live pay-per-view event on a live streaming website where advance notices of the potentially infringing material were delivered to the service provide.

The court is persuaded, not by Square Ring's lengthy and convoluted attempts to utilize 17 U.S.C. 411(c) nor by its self-serving declarations, but rather by the complete lack of legal precedent for this factual situation. The court is not prepared to make a factual determination as to whether UStream acted expeditiously as required by the safe harbor provision. A number of questions of fact exist as to what precisely was done during the time period in which UStream received the March 17, 2009 notices and the ultimate takedown on March 23, 2009, a full forty-eight hours after the DMCA-compliant notices were received.

For the above reasons, the court concludes that there are material issues of fact that warrant proceeding to trial.

## V. CONCLUSION

For the aforementioned reasons, the court will deny UStream's Motion for Summary Judgment (D.I. 100).

Dated: January 23, 2015

UNITED STATES DISTRICT JUDGE

14